UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x
SHAWN LAWTON and GINA
JOHNSON-LAWTON, on their own
behalf and on behalf of their minor son,
I.L.; FOLAKE WIMBUSH, on her own
behalf and on behalf of her minor son,
S.S.; FOLAKE OGUNDIRAN, on her own
behalf and on behalf of her minor
daughter, M.C.; MONIQUE JEFFREY, on
her own behalf and on behalf of her minor
son, B.S.; and SHANICE GIVENS, on her
own behalf and on behalf of her minor son,
C.S.;

**MEMORANDUM AND ORDER**

1:15-cv-07058(FB)(SMG)

        Plaintiffs,

    -against-

SUCCESS ACADEMY CHARTER
SCHOOLS, INC.; SUCCESS ACADEMY
FORT GREENE; CANDIDO BROWN;
and JANE DOES 1-3 and JOHN DOES 1-
3,

        Defendants.
----------------------------------------------------x

*Appearances:*
*For the Plaintiffs*
KATIE ROSENFELD
RUTH LOWENKRON
IRENE MENDEZ
New York Lawyers for the Public Interest
151 West 30th Street, 11th Floor
New York, NY 10001

*For the Defendants*
VANESSA M. BIONDO
AARON M. SAFANE
CHRISTOPHER N. LAVIGNE
Success Academy Charter Schools
95 Pine Street, Floor 6
New York, NY 10005

*For the Plaintiffs, cont.*
ALAN M. KLINGER
BETH A. NORTON
KAYLEY R. MCGRATH
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038

ARTHUR SCHWARTZ
LAURA BARBIERI
Advocates for Justice,
Chartered Attorneys
225 Broadway, Suite 1902
New York, NY 10007

*For the Defendants, cont.*
LINDA H. MARTIN
ROBERT J. MCCALLUM
ERIC BRANDON
STEPHEN PEARSON III
Freshfields Bruckhaus Deringer US
LLP
601 Lexington Avenue
New York, NY 10022

**BLOCK, Senior District Judge:**

Plaintiffs, five minors and their parents, bring this disability discrimination and retaliation action against Success Academy Charter Schools, Success Academy Fort Greene (collectively, "Success Academy"), Success Academy Fort Greene's former principal Candido Brown ("Brown"), and six Doe defendants under § 504 of the Rehabilitation Act of 1973, 42 U.S.C. § 1983, and various state laws. Defendants move to dismiss plaintiffs' Second Amended Complaint ("SAC") under Federal Rule of Civil Procedure 12(b)(6), arguing plaintiffs have failed to exhaust their administrative remedies, failed to adequately plead their claims, and failed to file a notice of claim.[1] Defendants' motions are granted in part and denied in part.

---

[1] Success Academy and Brown each brings a separate motion to dismiss but make substantively the same arguments.

2

# I

Plaintiffs allege the following.

## A.    Success Academy and Brown

Success Academy is a system of charter schools in New York City that receives funding and other benefits from the federal, state, and city governments. It chooses its students via lottery. Success Academy Fort Greene is a school in the Success Academy system. Brown began as principal of Success Academy Fort Greene in October 2014.

Success Academy runs a strict disciplinary system known as the "Code of Conduct." Its zero-tolerance approach prohibits, among other things, failing to sit in the "Magic 5" sitting position[2] and requires the students to always be on task, stay engaged in learning, and comply with the dress code. Teachers use stopwatches to script the school day, and students must carry "air bubbles" in their mouths when walking from class to class so they do not speak to one another.

Behavior infractions are tracked with a green-yellow-red system. If a student violates the Code of Conduct, he is moved from green to yellow. A second violation moves the student from yellow to red. At this point, the student will be put in "cool down," often be moved to a different classroom, and receive zero credit for missed assignments. If moving the student does not work, the student is dismissed from school

_____

[2] This is a strict position that the children are required to sit in during classtime.

for the day. This requires the parent to leave work and pick up the student immediately; failure to do so results in formal suspension of the student and sometimes threats by the school to call the police or the Administration for Children's Services ("ACS").

## B. Alleged Discrimination Against The Plaintiffs

The five plaintiff children won the Success Academy lottery and were enrolled in the school at various times between 2013 and 2015. They were between the ages of four and five at the time of their enrollment. Though the details vary, the essence of their claims is the same: Each plaintiff struggled to comply with the strict disciplinary code and was consequently barred from the classroom.[3]

## 1. I.L.

I.L. attended Success Academy from September 2014 to February 2015. He has a speech impediment which "substantially limits him in a major life activity—namely, in learning . . . ." SAC ¶ 7. Success Academy regarded him "as having attention deficit/hyperactivity disorder ("ADHD") with impairments in his ability to concentrate and learn." *Id.* ¶ 8. I.L. struggled to conform to Success Academy's strict Code of Conduct and was removed from class on an almost daily basis. I.L.'s father, Shawn Lawton, attempted to keep I.L. on track by sitting in on classes under the school's

---

[3] Given the unrelenting nature of the disciplinary code, it is questionable whether Success Academy is a good fit for disabled children. Nonetheless, as will be discussed in the analysis section *infra*, federal law is unambiguous: Schools that accept federal funding cannot discriminate or retaliate against the disabled.

parental "open door policy." When he did so, I.L. was able to finish the school day. However, I.L. began to suffer from anxiety and depression stemming from his inability to function at Success Academy.

In December 2014, Mr. Lawton inquired about an individualized education plan ("IEP") for I.L. under the Individuals with Disabilities Education Act ("IDEA"). Success Academy then began an IEP evaluation, but while it was being conducted Brown met with Mr. and Mrs. Lawton and told them I.L. was not a "good fit" for Success Academy. He then barred Mr. Lawton from the classroom.

The evaluation was completed in January 2015 and a behavior management plan was recommended, but not implemented. The Lawtons began to receive daily phone calls, almost immediately after I.L. arrived at school, informing them that he had been put in "cool down" and threatening removals and suspensions. In February 2015, the Lawtons removed I.L. from Success Academy.

## 2.    S.S.

S.S. attended Success Academy from September 2013 to June 2015. He "is classified by the New York City Department of Education as an individual with a learning disability," namely ADHD, and "meets the state and federal definition of a child with a disability." *Id.* ¶ 11; 73. His disability "substantially limits him in major life activities—namely, in learning . . . ." *Id.* ¶ 12. Defendants also "regarded him as having a learning and/or behavioral disability . . . ." *Id.* S.S. also struggled to comply

with the Success Academy Code of Conduct, failing to remain in the Magic 5 position, having tantrums, showing displeasure while being punished, and fighting with other students. S.S. was removed from class almost daily and frequently dismissed early or suspended.

S.S.'s mother, Folake Wimbush, sought and was denied an IEP and then brought a *pro se* IDEA administrative complaint. While the proceeding was pending, S.S. became upset on a field trip to the Museum of Natural History. As a result, the teacher called the police, and he was taken to the pediatric psychiatric unit at St. Luke's Hospital. The following school year, S.S. withdrew from Success Academy.

### 3.    M.C.

M.C. attended Success Academy from September 2013 to December 2014. Though she has not been classified as having a learning disability, defendants regarded her as "having a learning and/or behavioral disability . . . ." *Id.* ¶ 16. She was frequently removed from classes, sent home from school three to four times a week, and suspended twice. The following school year, M.C.'s mother, Folake Ogundrian, asked for accommodations for her daughter. Three days later, Brown threatened to call the police on M.C. based on her "unsafe behavior" of not listening to teachers and running in the classroom. After this incident, Ms. Ogundrian removed her from Success Academy.

### 4. B.S.

B.S. attended Success Academy from September 2014 to June 2015. Though he has not been classified as having a learning disability, defendants "regarded him as having a learning and/or behavioral disability that impeded his ability to comply with Success Academy's rigid disciplinary code." SAC ¶ 20. He was sent home early from school three to four times a week and suspended approximately five times. On one occasion, he was suspended because his father was five minutes late picking him up on an early dismissal day. Brown and other school officials repeatedly pressured B.S.'s mother, Monique Jeffrey, to remove her son from the school. She finally relented and did so in September 2015.

### 5. C.S.

C.S. attended Success Academy from September 2014 to June 2015. He has "been diagnosed with ADHD and oppositional defiant disorder ("ODD")." *Id.* ¶ 24. In addition, "Success Academy perceived C.S. as having an autism spectrum disorder." *Id.* His "learning disability substantially limited him in major life activities—namely, in learning." *Id.* ¶ 25. C.S. also struggled to comply with the Code of Conduct and was frequently removed from class early, dismissed, and suspended. After Brown became principal, C.S. was suspended once or twice per week. In October 2014, C.S. was evaluated for an IEP and recommended for an Integrated Co-Teaching classroom. However, in November and December 2014, his mother, Shanice Givens, was

repeatedly pressured to remove her son from the school. In February 2015, the school administration threatened to turn him over to ACS if Ms. Givens did not pick him up from school within twenty minutes. Ms. Givens enrolled C.S. in public school the following year.

## C.     The "Got to Go" List

After the five students were disenrolled, the parents learned that Brown had intentionally targeted their children, among others, for removal using a so-called "Got to Go" list. The list targeted students, including those with disabilities or perceived disabilities, for removal from the school. The list was reported in a New York Times article, in which Brown acknowledged, "I felt I couldn't turn [Success Academy Fort Greene] around if these students remained." SAC ¶ 124.

## II

Defendants' principal argument is that plaintiffs' SAC in essence alleges a denial of free appropriate public education (commonly referred to as "FAPE"). Under 20 U.S.C. § 1415(*l*), the IDEA requires exhaustion of administrative remedies prior to bringing such a claim, even if the claim is ostensibly made under another statute.

The IDEA provides disabled students a right to a FAPE, which "comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry v. Napoleon Comm. Schs.*, 137 S. Ct. 743, 748-49 (2017) (quoting

20 U.S.C. §§ 1401(9), (26), (29)). Under the IDEA, an IEP is the "primary vehicle" for providing such an education. *Id.* at 749. The IDEA provides for extensive administrative proceedings that must be exhausted before parents may bring a civil lawsuit "to obtain relief that is available under the IDEA." *Hope v. Cortines*, 69 F.3d 687, 688 (2d Cir. 1995). This includes claims brought under other remedial statutes—most commonly, the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act—when those claims are for relief that is "available under the IDEA." *Id.*; *see also Fry*, 137 S. Ct. at 749-50.

However, plaintiffs are only required to exhaust the IDEA's administrative remedies when the "gravamen" of their claims is denial of a FAPE. *Fry*, 137 S. Ct. at 755. If a plaintiff brings an ADA or § 504 claim that alleges a standalone cause of action "independent of any FAPE denial," exhaustion is not required because "the only 'relief' the IDEA makes 'available' is relief for the denial of a FAPE." *Id.* at 754-55. This is not a "magic words" test, and plaintiffs may not circumvent the IDEA's exhaustion requirement through "artful pleading." *Id.* Instead, the "examination should consider substance, not surface." *Id.*

In *Fry,* the Supreme Court suggested two questions that may give a "clue [as] to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination." *Id.* at 756. "First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at

a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school . . . have pressed essentially the same grievance?" *Id.* If the answers to these two questions are yes, the complaint likely does not involve a FAPE. *Id.* If no, it probably does. *Id.*

Here, while plaintiffs' allegations occasionally touch on denial of a FAPE and failure to reasonably accommodate the students, the vast majority of the allegations, and thus the gravamen of the complaint, concern intentional discrimination and retaliation: Plaintiffs allege that Brown placed them on a "Got to Go" list intended to remove them and "other Success Academy Fort Greene students with actual or perceived disabilities" from the school. SAC ¶ 121. They also allege that Brown "deliberately targeted their children for removal from Success Academy," SAC ¶ 120, and that he did so "because of" the students' "actual or perceived disabilities," SAC ¶ 122. Plaintiffs allege Success Academy further discriminated against the students by "segregating the Child-Plaintiffs from the other students in the class," "denying the child plaintiffs the right to participate in the program to the same extent as other pupils," "expressly encouraging the Parent-Plaintiffs to remove their children" from the school, "repeatedly, and for extended periods of time, removing the Child-Plaintiffs from their respective classrooms," "dismissing them from school early," "suspending them repeatedly," and "failing to provide the Child-Plaintiffs with academic instruction during the time that they were removed from the classroom." SAC ¶ 135.

These allegations extend far beyond simple denial of a FAPE. The two questions posed by *Fry* support this conclusion. The disabled children would have a claim against a public library that placed them on a list of excluded patrons, used strict disciplinary rules to remove them on a daily basis, and threatened to call the police when faced with complaints about the mistreatment. So would disabled adults.

As the Eleventh Circuit recently explained in an analogous post-*Fry* case, allegations that a disabled student was repeatedly removed from class cannot be analyzed simply as a FAPE violation. *J.S., III, by and through J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 986 (11th Cir. 2017). Instead, they are "cognizable as a separate claim for intentional discrimination under . . . § 504" because they "implicate those further, intangible consequences of discrimination . . . that could result from isolation, such as stigmatization and deprivation of opportunities for enriching interaction with fellow students" and "reach beyond a misdiagnosis or failure to provide appropriate remedial coursework." *Id.* (citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999) (holding isolation is a form of discrimination)); *see also K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 360 (S.D.N.Y. 2005) (holding disabled student's isolation at lunch sufficient to support claim for discrimination).

The facts here are even more extreme than those in *J.S.* There, the disabled student was removed from class but still given coursework and instruction in the

school's weight room. *J.S., III*, 877 F.3d at 983-84. Here, the students were removed from the school entirely.

Finally, while *Fry* cautions that a party who "switch[es] midstream" from an IDEA claim to a discrimination claim may be attempting to circumvent the FAPE's exhaustion requirement, *Fry*, 137 S. Ct. at 757, that is not what happened here. Plaintiffs correctly recognized that some of their claims were barred by the exhaustion requirement and amended their complaint to focus on the claims that were not addressable by the IDEA. *See Fry*, 137 S. Ct. at 759 ("It is easy to imagine circumstances under which parents might start down the IDEA road and then change course and file an action under the ADA or the Rehabilitation Act that seeks relief that the IDEA cannot provide.") (Alito, J., concurring).[4]

### III

Even though plaintiffs' claims are not subject to exhaustion under IDEA, defendants also challenge the adequacy of their pleadings[5] for "fail[ure] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive, the complaint must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl.*

---

[4] Because plaintiffs' complaint does not allege claims for a denial of FAPE, the Court need not address plaintiffs' alternative argument that the exceptions to FAPE apply.

[5] Defendants also challenge the inclusion of Doe defendants; however, "courts have rejected the dismissal of suits against unnamed defendants . . . until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials." *Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998).

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**A.     Section 504 Claims**

**1.     Discrimination**

"A prima facie violation of Section 504 requires proof from the plaintiff that '(1) he is a '[disabled] person' under the Rehabilitation Act; (2) he is 'otherwise qualified' for the program; (3) he is excluded from benefits solely because of his [disability]; and (4) the program or special service receives federal funding." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 841 (2d Cir. 2014). "Such a claim, however, requires proof of bad faith or gross misjudgment." *Id.*

Defendants contend that plaintiffs have not sufficiently alleged that: (1) they each have qualifying disabilities; (2) they were discriminated against because of their disabilities; and (3) defendants' actions were the product of bad faith or gross misjudgment.

**a.     Plaintiff's Disabilities**

Title 29 U.S.C. § 705(20)(B), which all parties agree controls, holds that "the term 'individual with a disability' means . . . any person who has a disability as defined in section 12102 of Title 42." It covers: "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of

such an impairment; or (C) being regarded as having such an impairment. . . ." 42 U.S.C. § 12102(1)(A)-(C).

Three plaintiffs, I.L., S.S., and C.S., allege they have an actual disability and also allege they were regarded as disabled. Two plaintiffs, M.C. and B.S., are not disabled but rely exclusively on defendants regarding them as disabled.

Defendants contend that the actual disabilities of I.L., S.S., and C.S. do not "substantially limit[] one or more major life activities" as required by § 12102(1)(A). However, the definition of disability "shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of [the ADA]." *Id.* § 12102(4)(A). "Major life activities" is defined to include "learning, reading, concentrating, thinking, [and] communicating." *Id.* § 12102(2)(A).

Each of the actually-disabled plaintiffs alleges that he or she has a qualifying disability that limits their ability to learn. I.L. alleges that he has a speech impediment which "substantially limits him in a major life activity—namely, in learning." SAC ¶ 7. S.S. alleges that he "is classified by the New York City Department of Education as an individual with a learning disability," namely, ADHD, and "meets the state and federal definition of a child with a disability."*Id.* ¶ 11; 73. He also alleges that his disability "substantially limits him in major life activities—namely, in learning." *Id.* ¶ 12. C.S. alleges that he has "been diagnosed with ADHD and oppositional defiant disorder ("ODD")," *id.* ¶ 24, and that his "learning disability substantially limited him in major

life activities—namely, in learning," *id.* ¶ 25.

Defendants next argue that the two plaintiffs proceeding entirely on a regarded-as theory, M.C. and B.S., have failed to allege that the defendants perceived their disabilities to limit a major life activity. However, plaintiffs are no longer required to do so. In 2008, Congress passed the ADA Amendments Act ("ADAAA"). Pub. Law 110-325 (2008). Prior to the ADAAA, the Supreme Court had held that plaintiffs pursuing a "regarded as" theory did need to show that their perceived disability limited a major life activity. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489-91 (1999), *superseded by statute*, 42 U.S.C. § 12102(3)(A) (2008).

The ADAAA overturned this holding. Now:

> An individual meets the requirements of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment *whether or not* the impairment limits or is perceived to limit a major life activity."

42 U.S.C. § 12102(1)(C) (2008) (emphasis added).

The Committee Report for the new section confirmed the intent of the new language:

> [The Supreme Court's] restrictive rulings [including *Sutton*] conflict with the Court's earlier recognition . . . that the negative reactions of others are just as disabling as the actual impact of an impairment, a conclusion endorsed by Congress when it adopted the "regarded as" prong.
>
> The Committee therefore restores Congress's original intent by making clear that an individual meets the requirement of "being

15

regarded as having such an impairment" if the individual shows that an action (e.g. disqualification from a job, program, or service) was taken because of an actual or perceived impairment, *whether or not* that impairment actually limits or is believed to limit a major life activity.

H.R. Rep. No. 110-730, pt. 1, at 14 (2008) (emphasis added).

The Second Circuit has addressed the new statutory language in only one published case, *Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012), where it held that the plaintiff "was not required to present evidence of how or to what degree [the defendants] believe the impairment affected him." 673 F.3d at 129. Instead, the plaintiff "was only required to raise a genuine issue of material fact about whether [defendants] regarded him as having a mental or physical impairment." *Id.*

Although *Hilton* dealt with a motion for summary judgment, and this case is only at the pleading stage, the analysis of law is the same. The only difference is that plaintiffs are only required to allege, rather than prove, that defendants regarded them as disabled. M.C. and B.S. have sufficiently done so: They allege that defendants regarded them as having a "learning and/or behavioral disability." SAC ¶¶ 16, 20. And though not required to do so, they have also alleged that Success Academy regarded these abilities as impairing a major life function—learning—and that the disabilities "interfered with [their] ability to comply with Success Academy's disciplinary code," SAC ¶¶ 96, 107, and in the case of B.S., that it further "interfered with his ability to do

well academically," SAC ¶ 107.[6]

Therefore, all five plaintiffs have sufficiently alleged they were actually or regarded as disabled.

**b.    Causation**

Alternatively, defendants argue that plaintiffs did not sufficiently allege that defendants punished the plaintiffs because of their disabilities; rather, they contend that they were punished for violations of the student code unrelated to their disabilities.

Plaintiffs must allege that their denial of benefits occurred "by reason of . . . disability," 42 U.S.C. § 12132, which should be "construed broadly." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003). The SAC alleges that "[e]ach of the Child-Plaintiff [sic] were [sic] included on Brown's "Got to Go" list, and was subjected to the disciplinary consequences set forth above, *because of* his or her actual or perceived disabilities." SAC ¶ 122 (emphasis added). This is sufficient for pleading purposes. Defendants' argument regarding their true motive for disciplining plaintiffs raises a factual dispute inappropriate for resolution on a Rule 12(b)(6) motion. *See E.E.O.C. v. Port Authority*, 768 F.3d 247, 253 (2d Cir. 2014) (courts must "accept all

---

[6]  Defendants also argue that these two plaintiffs cannot proceed because "the 'regarded as' theory of disability is no longer actionable in the context of a failure to accommodate claim." Success Academy's Br. at 17; Brown's Br. at 10 (both quoting *Graham v. Three Vill. Cent. Sch. Dist.*, 2013 WL 5445736, at *11 (E.D.N.Y. Sept. 30, 2013) (citing 42 U.S.C. § 12201(h))). Defendants' argument misses the point because plaintiffs are bringing a claim for discrimination, not failure to accommodate.

factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.").

### c.     Bad Faith or Gross Misjudgment

Finally, defendants argue plaintiffs have failed to adequately allege "bad faith or gross misjudgment" on behalf of the defendants. *C.L.*, 744 F.3d at 841. Success Academy characterizes plaintiffs' SAC as "at most alleg[ing] errors in judgment by Success in implementing its disciplinary code and identifying and accommodating Plaintiffs' disabilities." Success Academy's Br. at 18. Similarly, Brown characterizes the SAC as "alleg[ing] that Mr. Brown acted in the interest of improving the school and that his 'actions were the result of his training by Success Academy, and were at all times intended to reflect and comply with SA's practices, policies, and procedures.'" Brown's Br. at 12 (quoting SAC ¶¶ 123, 147).

However, the complaint is rife with allegations of bad faith or gross misjudgment, not the least of which was the establishment of the "Got to Go" list targeting disabled students for removal, as well as the daily removals, frequent suspensions, and repeated threats to call the police and ACS on four- and five-year-olds, which were sometimes acted upon. These allegations are sufficient to show more than "errors in judgment" on the part of Success Academy and Brown.

## 2.    Retaliation

I.L., M.C., and their parents allege that they were retaliated against when the parents sought to pursue reasonable accommodation for their children's disabilities. "The elements of a retaliation claim under . . . Section 504 . . . are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002).

Defendants argue that these plaintiffs have not shown that they were engaged in a protected activity or that they were subjected to an adverse action. Plaintiffs allege two acts of retaliation. First, shortly after Mr. Lawton attempted to supervise I.L. in class and secure accommodations for I.L.'s disability, Brown met with the Lawtons, pressured them to disenroll I.L., and barred Mr. Lawton from sitting in class with I.L. Second, three days after Ms. Ogundiran asked Brown to make accommodations for M.C., Brown threatened to call the police on M.C. for not listening to her teachers and running in a classroom.

These requests for accommodation constitute protected activity, and threatening to contact authorities and refusing to accommodate a disability in response to these requests can constitute adverse action. *Id.*, 287 F.3d at 149. To be sure, the gravamen of plaintiffs' *discrimination* claims is the exclusion and isolation of the students, not

failure to provide reasonable accommodation. But seeking such accommodation is still protected activity for the purpose of their retaliation claims. *See id.* (holding "threatening (and instituting) child welfare investigations," "threatening to file child abuse charges," and "refusing to academically evaluate and place [a disabled student] according to her abilities, allegedly in retaliation for plaintiffs' attempts to obtain reasonable accommodations" were adverse actions sufficient to support a § 504 retaliation claim).

Nor does it necessarily matter that M.C. was not legally due any reasonable accommodation because "plaintiff need not establish that the conduct [s]he opposed was actually a violation of the statute so long as [s]he can establish that [s]he possessed a 'good faith, reasonable belief that the underlying challenged actions . . . violated th[at] law.'" *Sarno v. Douglas-Elliman Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)); *see also Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999) (applying *Sarno* to plaintiff who was not actually disabled). It is implicit from the SAC that M.C.'s mother was pursuing accommodations for her daughter in good faith.

Defendants finally argue that plaintiffs have not alleged a causal connection between the adverse actions and the protected conduct. However, plaintiffs explicitly allege that this "causal connection exists," SAC ¶¶ 155; 160, since they allege that the adverse actions happened days after the protected activity, SAC ¶¶ 60-63; 93. A "close

temporal relationship" between these events "can be sufficient to establish causation." *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002).

**3.      Hostile Learning Environment**

"[A] hostile-learning-environment claim 'has yet to be recognized by the Second Circuit.'" *Yennard v. Herkimer BOCES*, 241 F. Supp. 3d 346, 365 (N.D.N.Y. 2017) (quoting *Hamilton v. City Coll. of City Univ. of N.Y.*, 173 F. Supp. 2d 181, 185 n.1 (S.D.N.Y. 2001)). However, one out-of-circuit district court has embraced the claim, *Guckenberger v. Boston University*, 957 F. Supp. 306, 314 (D. Mass. 1997), and one in circuit district court has followed suit, adopting *Gluckenberger's* rationale that the language in Title III of the ADA and § 504 of the Rehabilitation Act "is substantially similar to Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681-88 (1988)." *Pell v. Trustees of Columbia Univ.*, 1998 WL 19989, at \*17 (S.D.N.Y. Jan. 21, 1998) (quoting *Guckenberger*, 957 F. Supp. at 313-14). Other in-circuit district courts have accepted the claim *arguendo* but rejected it on the merits. *See Spychalsky v. Sullivan*, 2003 WL 22071602, at \*12-14 (E.D.N.Y. Aug. 29, 2003); *Hamilton v. City Coll. of City Univ. of N.Y.*, 173 F. Supp. 2d 181, 185 n.1 (S.D.N.Y. 2001).

This Court agrees with *Guckenberger* and *Pell*; a hostile learning environment is just as invidious as a hostile work environment. However, here plaintiffs fail to adequately allege its existence.

In embracing the rationale underlying Title VII, the *Guckenberger* court perforce concluded that "the flexible Title VII standards for establishing a hostile work environment claim apply to hostile learning environment claims brought under the federal statutes prohibiting discrimination against person with disabilities." 957 F. Supp. at 314 (citing *Brown v. Hot, Sexy and Safer Prods., Inc.*, 68 F.3d 525 (1st Cir. 1995), *overruled on other grounds by Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)). Therefore, it held that to state a cognizable claim for hostile learning environment, a plaintiff must allege that: (1) she is a member of a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment is based on a protected characteristic, her disability; (4) the harassment is sufficiently severe or pervasive that it alters the conditions of her education and creates an abusive educational environment; and (5) there is a basis for institutional liability. *Id.* Such a claim is "actionable as illegal discrimination only if the environment is 'permeated with discriminatory intimidation, ridicule, and insult.'" *Id.* at 315 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).

Plaintiffs do not allege any offensive remarks, ridicule, or scorn. Instead, their complaint is focused on adverse actions taken against them, rather than insults and ridicule hurled their way. Their complaint is "devoid of the sharply-pointed, crudely-crafted, and frequently-launched 'slings and arrows' that courts have found sufficient to establish severe and pervasive harassment. . . ." *Guckenberger*, 957 F. Supp. at 315.

## C.     Section 1983 Claim

Plaintiffs allege a violation of 42 U.S.C. § 1983 against Brown in his individual capacity on the basis that he violated their § 504 rights. "The Second Circuit has held that a Section 1983 claim can be maintained against individual defendants on the basis of . . . Section 504 violations." *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 362 (S.D.N.Y. 2005) (citing *Weixel*, 287 F.3d at 151).

Brown asserts a defense of qualified immunity. "A government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate clearly established rights or if it would have been objectively reasonable for the official to believe his conduct did not violate plaintiff's rights." *Reuland v. Hynes*, 460 F.3d 409, 419 (2d Cir. 2006) (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003))."*[U]sually,* the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion" unless "the facts supporting the defense appeared on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004). It must "appear[] beyond doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* at 436 (quoting *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992)).

Here, plaintiffs allege facts, such as Brown's Got-to-Go list, that, if proven, could establish intentional and systemic discrimination against students with disabilities, as well as his retaliation against two of the students' parents for attempting to protect those

students' rights.

"[T]he right not to be subjected to disability discrimination has long been clearly established[.]" *Coleman v. Town of Old Saybrook*, 2004 WL 936174, at *4 (D. Conn. Apr. 28, 2004). A reasonable school official could not believe that such conduct, as alleged, did not violate § 504.

## D. State Law Claims

New York law requires a plaintiff to file a notice of claim prior to commencement of an action against a school district and/or its employees within 90 days after the claim arises. *L.K. v. Sewanhaka Cent. High Sch. Dist.*, 2015 WL 12964663, at *15 (E.D.N.Y. July 16, 2015); N.Y. Gen. Mun. Law § 50-e; N.Y. Educ. Law § 3813. This requirement has been extended to charter schools. *Rodriguez v. Int'l Leadership Charter Sch.*, 2009 WL 860622, at *6 (S.D.N.Y. Mar. 30, 2009). Failure to comply with this requirement is a "fatal defect." *Scaggs v. N.Y. State Dep't of Educ.*, 2007 WL 1456221, at *19 (E.D.N.Y. May 16, 2007) (quoting *Parochial Bus Sys., Inc. v. Bd. of Educ.*, 60 N.Y.2d 539, 547 (N.Y. 1983)). Here, it is undisputed that plaintiffs did not file their notices of claim until after the 90-day window expired. Therefore, plaintiffs' state law claims are barred.

**IV**

Defendants' motions to dismiss are granted with respect to plaintiffs' hostile learning environment claim and state law claims. They are otherwise denied.

**SO ORDERED**

    /S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
August 1, 2018