UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x
SHAWN LAWTON and GINA JOHNSON-LAWTON,    :
*on their own behalf and on behalf of their minor son, I.L.,* :
FOLAKE OGUNDIRAN, *individually and as a Parent of* :
*M.C.*, MONIQUE JEFFREY, *individually and as a Parent* :
*of B.S.*, SHANICE GIVENS, *individually and as a Parent* :
*of C.G.,* and FOLAKE WINBUSH, *individually and as a* :
*Parent of S.S.*,                                  :
                                                   :
                                        Plaintiffs,    :          REPORT &
                                                   :          RECOMMENDATION
                                                   :          15-CV-7058 (FB) (SMG)
          -against-                                :
                                                   :
SUCCESS ACADEMY OF FORT GREENE, SUCCESS   :
ACADEMY CHARTER SCHOOLS, INC., CANDIDO    :
BROWN, JOHN DOES 1-3, and JANE DOES 1-3,   :
                                                   :
                                        Defendants.    :
------------------------------------------------------------------------- x
GOLD, STEVEN M., U.S. Magistrate Judge:

## INTRODUCTION

Plaintiffs Shawn Lawton, Gina Johnson-Lawton, Folake Ogundiran, Monique Jeffrey,

Shanice Givens, and Folake Winbush bring this action on their own behalf and on behalf of their

minor children who attended defendant school, Success Academy of Fort Greene ("Success

Academy"). Plaintiffs assert claims pursuant to Section 504 of the Rehabilitation Act of 1973

("Section 504"), 29 U.S.C. § 794, and the Civil Rights Act ("Section 1983"), 42 U.S.C. § 1983,

alleging that the school and former principal, defendant Candido Brown, discriminated against

those students who either had disabilities or were perceived to have disabilities. Am.

Consolidated Compl. ("Compl.") at 1–5, Dkt. 17.[1]

---

[1] Prior to the filing of this Complaint, plaintiffs filed two other complaints in case 15-cv-7058. *See* Dkt. 1; Dkt. 8. The operative version filed at Dkt. 17 is a consolidated, amended Complaint filed on behalf of two groups of plaintiffs who initially filed suit separately and it includes an amended caption to reflect plaintiffs' voluntary dismissal of defendants New York City Department of Education and New York City Department of Education. *See* Dkt. 8; Dkt. 16.

Although they have "resolved all substantive issues in the case, including the settlement amount to be paid to Plaintiffs," Ltr. dated May 4, 2020, Dkt. 152, the parties have been unable to agree on the amount plaintiffs' attorneys should recover in fees, Ltr. dated June 9, 2020, Dkt. 153. As a result, plaintiffs filed a motion for attorneys' fees on July 15, 2020, defendants[2] filed their opposition on August 17, 2020, and plaintiffs filed a reply on August 31, 2020. Dkt. 157; Dkt. 161; Dkt. 163. By Order dated July 16, 2020, the Honorable Frederic Block referred plaintiffs' motion to me for Report and Recommendation.

After a careful review of the time records and the other materials submitted by the parties, I respectfully recommend that plaintiffs' application for an award of attorneys' fees be granted, subject to the reductions set out below.

## BACKGROUND

### I.    Plaintiffs' Application

Plaintiffs seek a total of $2,177,105.00 in attorneys' fees for work performed from October 30, 2015 through February 7, 2020, by three legal groups, in addition to $75,602.69 in costs. Decl. of Alan M. Klinger ("Klinger Decl.") ¶ 10, Dkt. 157-14; Decl. of Kayley R. McGrath ("McGrath Decl.") ¶ 16, Dkt. 157-2. Of the total fees sought, the Stroock & Stroock & Lavan LLP law firm ("Stroock") seeks $966,085.00, Advocates for Justice, Chartered Attorneys, ("AFJ") seeks $405,777.50, and New York Lawyers for the Public Interest ("NYLPI") seeks $798,610.50.[3] Klinger Decl. ¶ 10; Decl. of Ruth Lowenkron ("Lowenkron Decl.") ¶ 7, Dkt. 157-

---

[2] "Defendants" collectively refers to the Success Academy defendants and the individual defendant Candido Brown. These parties have submitted a single joint memorandum in opposition to plaintiffs' motion for attorneys' fees. *See* Defs.' Mem. at 26.

[3] There is a discrepancy between the total fees sought by NYLPI ($805,242.50) as stated in Ms. Lowenkron's declaration and the sum of the fees sought by each individual attorney that worked on behalf of NYPLI ($798,610.50) as stated in the chart that follows Ms. Lowenkron's statement. *See* Lowenkron Decl. ¶ 7. By the Court's own calculation, the lower total is the sum of each individual attorney's requested fees and is therefore treated as the intended total.

8.  Thirteen attorneys request compensation, including four attorneys from Stroock, six attorneys from NYLPI, and three attorneys from AFJ.  McGrath Decl. ¶ 21; Lowenkron Decl. ¶ 7; Decl. of Laura D. Barbieri ("Barbieri Decl.") ¶ 10, Dkt. 157-11.  NYLPI also seeks compensation for work performed by two professionals described as holding the title "Senior Advocate/paralegal" with backgrounds in social work.  Lowenkron Decl. ¶¶ 4, 7; Decl. of Kevin M. Cremin ("Cremin Decl.") at 6, Dkt. 157-16; Pls.' Mem. at 12.

Given the many plaintiffs' attorneys involved this litigation, and because five plaintiffs' attorneys appeared before the Court at the initial conference, I advised counsel early on to "figure out what [they] think is a reasonable number of [attorneys] and to track the billing in a way that's appropriate," and noted that "if we don't lay those ground rules now we're going to have difficulty…figuring out what an appropriate attorney's fee is later."  Tr. of Sept. 20, 2016, at 7:10-18, Dkt. 43.  I also warned that billing for five lawyers at an initial case management conference, or even at trial, was untenable.  *Id.*  Plaintiffs now assure the Court that counsel litigated this matter "with careful attention to avoid duplicative efforts" and "divided litigation tasks along discrete lines and coordinated to file and serve finished work products."  Mem. of Law in Supp. of Pls.' Mot. for Fees and Costs ("Pls. Mem.") at 13, Dkt. 157-1.  Specifically, plaintiffs represent that AFJ was primarily involved in researching and preparing the Complaint and other written materials and meeting with defendants to discuss discovery and settlement; NYLPI filed the consolidated Complaint, managed relationships with the plaintiffs throughout the motion to dismiss, and took the lead in opposing defendants' motion to dismiss and arguing some of plaintiffs' motions to compel; and Stroock researched plaintiffs' claims, briefed multiple discovery disputes, managed document discovery and plaintiffs' experts, and managed relationships with plaintiffs after the motion to dismiss.  *Id.* at 13–14.

Plaintiffs have preemptively made reductions to their fee requests, including by

> (1) AFJ waiving its one-third contingency fee agreements with each Plaintiff family; (2) AFJ writing off all costs and disbursements (except for a filing fee), including not charging for Westlaw/Lexis case law research[;] (3) AFJ writing off all time spent by its legal interns; (4) AFJ writing off all time spent by attorneys on intra-office conferences; (5) AFJ writing off significant time spent drafting and editing email correspondence; (6) NYLPI not billing for time spent on the case by its litigation director; (7) NYLPI writing off all research time spent by its legal interns; (8) Stroock greatly reducing its billing rates; (9) Stroock writing off all time billed by co-managing partner Alan M. Klinger; (10) Stroock writing off all time billed by junior associates for document review; (11) Strook writing off time billed by its proofreading department, litigation support, paralegals, library, and IT personnel; and (12) Stroock writing off all costs and disbursements other than expert and mediation fees and costs for Westlaw/Lexis case law research.

*Id.* at 8; Barbieri Decl. ¶ 12; Lowenkron Decl. ¶ 8; McGrath Decl. ¶ 15.

## II.    Procedural History

A brief summary of this five-year litigation provides context for plaintiffs' present fee application, particularly with respect to the complexity of the litigation and the number of hours logged.

### A. *Plaintiffs' Allegations*

AFJ first initiated this suit on December 10, 2015, on behalf of four of the five plaintiff families. Pls.' Mem. at 3; Barbieri Decl. ¶ 5. The action was consolidated in May 2016 with a case filed by NYLPI and Stroock on behalf of another plaintiff family, the Lawtons. Pls.' Mem. at 4; *see* Order dated May 2, 2016.

The consolidated Complaint alleges that the minor plaintiffs, also referred to herein as the child-plaintiffs, were discriminated against based on their actual or perceived disabilities while enrolled in kindergarten at defendant Success Academy Charter School in Fort Greene ("Success Fort Greene"). Compl. ¶¶ 1–2. Specifically, plaintiffs, some of whom suffer from speech

impediments or learning disabilities, were "subjected to unrelenting punishment from school employees, ranging from removal from the classroom to early dismissals and suspensions"; in some instances, defendants' employees also "threatened—and, in at least one instance, carried out the threat—to call the police or the Administration for Children's Services to take custody of children because of their 'unsafe' behavior (such as running in a classroom, not listening to a teacher, or having a tantrum)." *Id.* ¶¶ 2, 6–26.  Plaintiffs allege that defendants used these severe disciplinary tactics to "intimidate and push out students with actual or perceived disabilities, like Child-Plaintiffs, whom Defendants regarded as undesirable pupils for Success Academy schools." Pls.' Mem. at 4; McGrath Decl. ¶ 5; *see* Compl. ¶¶ 44–119.  In support of these allegations, plaintiffs quote a New York Times' article reporting that the principal of Success Fort Greene, defendant Candido Brown, had compiled a "Got to Go" list of students he wanted removed from the school and allege that the list included all of the child-plaintiffs.  Compl. ¶¶ 3, 120–24.

### B.  *Defendants' Motion to Dismiss*

Defendants initially responded to plaintiffs' consolidated Complaint by expressing their intention to file a motion to dismiss.  *See* Dkt. 28; Dkt. 29.  That motion was not fully briefed until July 2018, primarily because the parties were participating in what proved to be an unsuccessful attempt at mediation from December 2016 through July 2017.  *See* Order dated Dec. 27, 2016; Report dated July 20, 2017.  Defendants' motion argued that plaintiffs could not "pursue claims [under Section 504] in court concerning the right to a free appropriate public education ("FAPE") without first exhausting their administrative remedies."  Defs.' Mem. in Supp. of Mot. to Dismiss at 1, Dkt. 93.  Plaintiffs, relying on a Supreme Court opinion issued while the parties were preparing for mediation, *see Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743

(2017), countered that exhaustion was not required because they were "seeking relief for [defendants'] discriminatory conduct, and not the denial of FAPE (or any other aspect of the provision of special education services)."  Pls.' Mem. in Opp to Mot. to Dismiss at 4–5, Dkt. 97. Judge Block agreed with plaintiffs' arguments and, applying *Fry*, found that the plaintiffs' allegations "extend[ed] far beyond simple denial of a FAPE" and were therefore not subject to exhaustion requirements.  Mem. & Order at 9–11, Dkt. 104.

Defendants' motion further argued pursuant to Fed. R. Civ. P. 12(b)(6) that the operative Complaint failed to state claims on which relief could be granted under Section 504, Section 1983, and state law.  *Id.* at 12, 23–24; *see also* Defs.' Mem. in Supp. of Mot. to Dismiss at 16–24; Def. Brown's Mot. to Dismiss at 17, Dkt. 96.  Judge Block ruled in plaintiffs' favor on all grounds except with respect to their hostile learning environment claim asserted under Section 504 and their state law claims, leaving intact plaintiffs' discrimination and retaliation claims under federal law.  Mem. & Order at 21, 24–25.  Still, though Judge Block ultimately found the facts as alleged insufficient to support a hostile learning environment claim, he agreed with plaintiffs to the extent that he recognized the validity of the relatively novel claim.  *See id.* at 21–22; Pls.' Mem. in Opp to Mot. to Dismiss at 19.  *But see* Defs.' Mem. at 23–24 (arguing that, though the Second Circuit has not addressed the validity of the hostile learning environment claim, other courts within the Circuit have concluded it is a valid cause of action).

## C.  Persistent Discovery Disputes

Discovery disputes arose often throughout this litigation.  Plaintiffs characterize the disputes as resulting from defendants' repeated failure to "produce *any* ESI" and claim that, even following motion practice leading to an order directing electronic discovery to proceed, the defendants "withheld and/or redacted significant portions of produced documents under dubious

claims of privilege and produced a woefully incomplete privilege log." Pls.' Mem. at 5, 7. Defendants counter that plaintiffs, even after the Court suggested it was time to proceed to depositions, "ran up needless fees and costs, submitting dozens of extra discovery requests, hunting for evidence and documents that plainly did not exist, and repeatedly making applications to the Court that were largely denied and brought without trying to resolve them with Defendants first." Defs.' Mem. at 1. In total, plaintiffs filed three motions to compel, *see* Dkt. 53; Dkt. 134; and Dkt. 147; the Court granted the first, granted the second in part after an *in camera* review, and denied the last motion based on the plaintiffs' failure to meet and confer with defendants prior to filing the motion, *see* Order dated Jan. 12, 2017; Dkt. 137; Dkt. 142; Order dated Feb. 28, 2020. Defendants also filed a discovery motion seeking Court intervention in response to plaintiffs' discovery requests while the motion to dismiss was pending, *see* Dkt. 75, which the Court granted, *see* Order dated Sept. 7, 2017.

Regardless of whether the parties could have discovered the information they required more efficiently and with fewer disputes and motions, discovery in this lawsuit was inherently complex and some amount of motion practice was virtually inevitable. Because the suit was brought on behalf of school age children against a school, both parties were in possession of as well as seeking from the other sensitive information that implicated the privacy of minors. *See, e.g.,* Dkt. 70 (resolving plaintiffs' discovery motion filed in connection with a proposed protective order and limiting disclosure of confidential information produced by defendants concerning the minor plaintiffs). Discovery in this suit was also complicated by nuanced attorney-client privilege questions arising from the fact that the CEO of Success Academy is married to an attorney and apparently consulted with him on legal issues that the defendants faced. *See* Tr. of Jan. 3, 2020, at 9:16–10:2, Dkt. 144.

*D.  Offer of Judgment*

Ultimately, after several months of briefing various discovery disputes, several on which plaintiffs prevailed at least in part (including one that resulted in a two-hour *in camera* review of dozens of documents), defendants made an offer of judgment of $1,100,000.00, plus reasonable attorneys' fees and costs, that was accepted by plaintiffs.  Defs.' Mem. at 6–8; McGrath Decl. ¶ 14.  The parties, however, as noted above, were unable to reach an agreement on attorneys' fees and costs.

DISCUSSION

## I.    Attorneys' Fees Award

In an action brought pursuant to Section 1983 and Section 504, the Court may award the "prevailing party" "a reasonable attorney's fee."  42 U.S.C. § 1988(b); 29 U.S.C. § 794a(b).  A prevailing plaintiff is "one who 'has succeeded on any significant issue in litigation which achieved some of the benefit the parties sought in bringing suit.'  *Stone v. Port Auth. of N.Y. & N.J.*, 2015 WL 1840622, at *2 (E.D.N.Y. Apr. 22, 2015) (quoting *Tex. St. Tchrs. Ass'n v. Garland Ind. Sch. Dist.*, 489 U.S. 782, 791–92 (1989)).  "The Second Circuit has held that plaintiffs who accept Rule 68 offers of judgment qualify as 'prevailing parties' entitled to attorneys' fees and costs."  *Williams v. City of New York*, 2017 WL 1906899, at *1 (S.D.N.Y. May 9, 2017).  Plaintiffs here, having induced defendants to make an offer of judgment that plaintiffs found acceptable, are thus clearly entitled to an award of reasonable attorneys' fees.

Defendants do not challenge plaintiffs' entitlement to attorneys' fees, but insist that the amount of attorneys' fees awarded should be no greater than one-third of the amount recovered by their clients, and not calculated according to counsel's lodestar, or by multiplying a reasonable number of hours by a reasonable hourly rate.  *See* Defs.' Mem. at 9–10.  There is,

however, no reason in this case to depart from the lodestar approach, which, as defendants

acknowledge, is how "courts typically set attorneys' fees." *Id.* at 9.

Defendants' invocation of *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)

in support of the percentage method is misplaced. Though the Second Circuit declared in

*Goldberger* that "either the lodestar or percentage of the recovery methods may properly be used

to calculate fees in *common fund* cases," *id.* at 45 (emphasis added), it did so in the context of a

class action that settled for a gross amount intended to cover payments to class members as well

as attorneys' fees. Each of the other cases cited by defendants in support of applying the

percentage approach also involved gross settlement amounts to be apportioned between plaintiffs

and counsel. *See S.W. v. City of New York*, 2012 WL 6625879, at *3 (E.D.N.Y. Dec. 19, 2012)

(awarding attorneys' fees in the amount of one-third of the settlement fund in case brought and

settled on behalf of minor plaintiffs); *Hicks v. Stanley*, 2005 WL 2757792, at *8 (S.D.N.Y. Oct.

24, 2005) (favoring the percentage approach in class actions and granting attorneys' fees in an

amount of 30% of the settlement fund). The percentage approach is also, of course, appropriate

when an attorney and client have entered into a retainer agreement providing for that

arrangement. *See, e.g., D. v. City of New York*, 2016 WL 4734592, at *6 (S.D.N.Y. Aug. 22,

2016), *report and recommendation adopted*, 2016 WL 4735365 (S.D.N.Y. Sept. 9, 2016).

Here, in contrast, there is no common fund, class action, or operative retainer agreement;

instead, the client's award is finalized, *see* Dkt. 160, and plaintiffs' attorneys seek a separate fee

award. Thus, unlike in the cases cited above, the amount of fees awarded to counsel will have no

impact upon the amount recovered by plaintiffs. In addition, "[t]his case is already settled, so the

method selected [to calculate attorneys' fees] will not impact the attorneys' behavior here,"

*Marshall v. Deutsche Post DHL*, 2015 WL 5560541, at *6 (E.D.N.Y. Sept. 21, 2015), and the

Court sees no reason to deviate from the typical lodestar approach.  *See Ebbert v. Nassau Cty.*, 2011 WL 6826121, at *14 (E.D.N.Y. Dec. 22, 2011) ("Where the attorneys' fees are to be paid directly by the Defendants and, therefore, money paid to the attorneys is entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members." (internal quotation marks and citation omitted)).

Moreover, to the extent that defendants suggest the lodestar approach should be disfavored because it results in a fee award which (as calculated by plaintiffs) is almost double the client's recovery, this argument is without merit.  As established in *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986), "[t]he mere fact that the fee sought exceeds the plaintiff's recovery does not preclude an award based upon the lodestar calculation." *Peacock v. Schwartz*, 154 F. Supp. 2d 428, 430–31 (E.D.N.Y. 2001) (collecting cases).  Especially in cases such as this one where important public policy concerns are at issue but the financial recovery may not be exceptionally large, "calculating attorneys' fees as a proportion of damages runs directly contrary to the purpose of fee-shifting statutes: assuring that civil rights claims of modest cash value can attract competent counsel." *Hui Luo v. L & S Acupuncture, P.C.*, 649 F. App'x 1, 3 (2d Cir. 2016).  Accordingly, I calculate plaintiffs' attorneys' fees using the lodestar method as set out in in the next section.

## II.    Reasonable Attorneys' Fees

"The party seeking reimbursement of attorney's fees bears the burden of proving the reasonableness and the necessity of the hours spent and rates charged." *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 51 (E.D.N.Y. 2015); *see generally N.Y.S. Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).  Well-established Second

Circuit doctrine requires that a fee application be supported by "contemporaneous time records" that "specify, for each attorney, the date, the hours expended, and the nature of the work done." *Carey*, 711 F.2d at 1148. "Failure to do so results in denial of the motion for fees." *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir. 1992); *see also Scott v. City of New York*, 626 F.3d 130, 133–34 (2d Cir. 2010). District courts have broad discretion in determining the reasonableness of an attorney's requested fees. *See Chocolatl v. Rendezvous Cafe, Inc.*, 2019 WL 5694104, at *14 (E.D.N.Y. Aug. 16, 2019).

Courts awarding attorneys' fees pursuant to the lodestar method calculate a "presumptively reasonable fee" by taking the product of the hours reasonably expended and a reasonable hourly rate. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008). In addition, courts should take into account case-specific variables such as

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 186 n.3 (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)).

At the outset, it is worth noting that many of the *Arbor Hill* factors support granting plaintiffs' counsel a substantial fee award. This litigation lasted more than five years and required plaintiffs' counsel to prevail on nuanced questions of law, such as when the exhaustion requirements of Section 504 apply to disability discrimination claims. In making their legal

arguments, plaintiffs were required to apply the Supreme Court's holding in *Fry*, which was pronounced as this litigation was ongoing.  As a result of plaintiffs' undertaking and expertise, Judge Block issued an opinion creating new law in this Circuit interpreting *Fry* and further articulating the exhaustion requirements applicable to disability discrimination claims.  *See* Mem. & Order. at 9–11 (applying the two questions set out in *Fry* "that may give a clue [as] to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination" to the facts of the plaintiffs' case (internal quotation marks omitted)).  This precedent may well guide future litigation in this important area of civil rights law.

Additionally, there is no doubt, as addressed in greater detail below, that plaintiffs' counsel brought a wide range of unique and valuable experience to this case; many of plaintiffs' attorneys not only have had distinguished legal careers, but have also substantial expertise in the specialties of education and disability law, and at least one has worked as a teacher and another is seeking an advanced degree in education.  *See* Pls.' Mem. at 10–13; Klinger Aff. ¶ 3; *see also Disability Rights New York v. N. Colonie Bd. of Educ.*, 2017 WL 1901958, at *6 (N.D.N.Y. May 8, 2017) ("[T]he level of skill possessed by plaintiffs' attorneys and their specialization in disability rights law served their client well and were material to the success of their action.").

Throughout this litigation, counsel also maintained client relationships under challenging circumstances.  Because this case involved emotionally charged claims, counsel were undoubtedly required to be extremely sensitive to the feelings of their clients about the facts that precipitated this suit, and to be both empathetic and pragmatic at the same time.  Counsel also needed to be attentive to the child-plaintiffs' privacy while still advancing their claims with zeal. *See* Tr. of Sept. 20, 2016, at 17:6-11 (discussing at the outset of this case how "one of the harder

questions we're going to confront is what is the appropriate scope of the medical discovery of the minor plaintiffs and…wanting to avoid any more intrusion on a child than is absolutely necessary[]y for the vindication [of] legitimately asserted rights."); *see also* Decl. of Elisa F. Hyman Decl. ¶¶ 34–38, Dkt. 157-15 (describing the difficulties of managing attorney-client relationships in these suits). Counsel's pursuit of compensatory damages on the child-plaintiffs' behalf further required weighing those privacy interests against counsel's attempts to maximize their clients' recovery. *See* Tr. of Sept. 20, 2016, at 17:20–18:9, 19:14–22:25 (discussing how to balance "meaningful discovery of the[] minor's medical condition[s]" with the plaintiffs "end game"). These challenges relating to the nature of the relationship with the client plaintiffs—not to mention the legal obstacles faced in bringing this suit and the investment of time required to litigate it—may well have made this suit "undesirable" to many attorneys.

Finally, plaintiffs' attorneys ultimately obtained a significant recovery of $1,100,000 for their clients. Defendants' suggestion that the final offer of judgment was not indicative of success but that the "merits phase only ended because the offer of judgment ended Plaintiffs' attorneys' incentive to accumulate fees," *see* Defs.' Mem. at 23, ignores plaintiffs' successes, most notably in fending off the primary arguments in defendants' motion to dismiss that plaintiffs' claims were unexhausted and failed to state a claim, arguments defendants presumably believed were meritorious when they asserted them.

Defendants also attempt to undermine plaintiffs' assertion that Judge Block's opinion was "the first interpretation in the Second Circuit of the Supreme Court's decision in *Fry*," by citing to other opinions from this Circuit that addressed *Fry* prior to the resolution of defendants' motion to dismiss. However, plaintiffs aptly point out that the cases cited by defendants did not include the same in-depth analysis and application of *Fry* as was undertaken by Judge Block. In

*Harrington v. Jamesville Dewitt. Cent. Sch. Dist.*, 2017 WL 1327719, at *9–*10 (N.D.N.Y. Apr. 11, 2017), the court dismissed a plaintiff's Rehabilitation Act claims because he failed to state a claim that he had been excluded from a program because of his disability; due to those grounds for dismissal, the court had no reason to determine whether the Section 504 claims required exhaustion under *Fry.* In *Avaras v. Clarkstown Cent. Sch. Dist.*, 2017 WL 3037402, at *26–*28 (S.D.N.Y. July 17, 2017), the Court set out the *Fry* holding but did not analyze the exhaustion issue; instead, having concluded that many of plaintiffs' claims under Section 504 were "completely duplicative" of her properly exhausted Individual with Disabilities in Education Act ("IDEA") claims, the court proceeded to dismiss the Section 504 claims seeking relief unavailable under IDEA for failure to plausibly allege disability discrimination.

That being said, and having acknowledged plaintiffs' skilled advocacy, the Court agrees with defendants that several aspects of plaintiffs' fee application, most notably the excessive hours resulting from overstaffing, warrant the reductions set out in the following sections.

### A. *Reasonable Hourly Rates*

A reasonable hourly rate reflects "what a reasonable, paying client would be willing to pay." *Arbor Hill*, 522 F.3d at 184. This rate should be based on rates "prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation." *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998); *Cruz v. Local Union No. 3 of IBEW*, 34 F.3d 1148, 1159 (2d Cir. 1994) (both citing *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). "Determination of the prevailing market rates may be based on evidence presented or a judge's own knowledge of hourly rates charged in the community." *Elvey v. Silver's Crust W. Indian Rest. & Grill, Inc.*, 2019 WL 3937126, at *14 (E.D.N.Y. July 3, 2019) (citing *Farbotko v. Clinton Cty. of N.Y.*, 433 F.3d 204, 209 (2d Cir. 2005)). "The 'community' is generally

considered the district where the district court sits." *Elvey*, 2019 WL 3937126, at *14 (citing

*Lochren v. Cty. of Suffolk*, 344 F. App'x 706, 708 (2d Cir. 2009)).

    1.  Out-of-District Rates

    Plaintiffs' attorneys argue that they are entitled to out-of-district rates, specifically those

in the Southern District of New York, because of the complexity of this action. Pls.' Mem. at

22–23. "[W]hen faced with a request for an award of higher out-of-district rates, a district court

must first apply a presumption in favor of application of the forum rule." *Simmons v. New York*

*City Transit Auth.*, 575 F.3d 170, 175 (2d Cir. 2009). The moving party may rebut this

presumption only by making "a particularized showing demonstrating the likelihood that the use

of in-district counsel would have produced a substantially inferior result [] because, for example,

the case required special expertise beyond the competence of forum district law firms." *N.Y.*

*Ass'n for Retarded Children v. Cuomo*, 2019 WL 3288898, at *2 (E.D.N.Y. July 22, 2019)

(internal quotation marks and citations omitted). In evaluating these applications, courts look for

evidence that plaintiffs sought the assistance of in-district counsel but found none who were

competent and willing to take on the case. *Compare Schwartz v. U.S. Drug Enf't Admin.*, 2019

WL 1299192, at *8 (E.D.N.Y. Mar. 1, 2019) (rejecting application for out-of-district rates where

"Plaintiff did not establish that 'local counsel possessing requisite experience were unwilling or

unable to take the case' or that 'in a case requiring special expertise, [] no in-district counsel

possessed such expertise'" (quoting *Simmons*, 575 F.3d at 175)), *report and recommendation*

*adopted*, 2019 WL 1299660 (E.D.N.Y. Mar. 21, 2019), and *United States v. City of New York*,

2013 WL 5542459, at *5 (E.D.N.Y. Aug. 30, 2013) ("Plaintiff–Intervenors cannot overcome the

presumption of in-forum rates without having made *any* contacts within the district."), *with*

*Harvey v. Home Savers Consulting Corp.*, 2011 WL 4377839, at *4 (E.D.N.Y. Aug. 12, 2011)

(granting application for out-of-district rates where plaintiff acquired co-counsel only after contacting "more than one hundred law firms in New York," which assured the court that "plaintiffs would have been unable to find a firm to act as co-counsel with sufficient resources and experience had they limited their search to law firms based in the Eastern District").

Plaintiffs here have failed to overcome this "difficult standard." *See N.Y. Ass'n for Retarded Children*, 2019 WL 3288898, at *4. Plaintiffs—understandably—tout the experience and expertise of Stroock, NYLPI, and AFJ, but fail to demonstrate that comparable counsel was unavailable in the Eastern District of New York. *See* Pls.' Mem. at 23. Though plaintiffs' presentation may indicate "that in-district counsel [is] harder to find, [] that is not enough to show that there is a complete dearth of such counsel." *N.Y. Ass'n for Retarded Children*, 2019 WL 3288898, at *4 (internal quotation marks and citation omitted). This case also, though it did last five years, never reached trial and is therefore clearly distinguishable from the most arduous cases where courts have found out-of-district rates appropriate. *See, e.g., Restivo v. Nassau County*, 2015 WL 7734100, *3 (E.D.N.Y. Nov. 30, 2015) (awarding senior attorneys an out-of-district rate of $700 per hour in case that lasted eight years, involved two trials, and presented complex issues of law with respect to DNA). Moreover, the expertise of plaintiffs' counsel is taken into consideration in setting each attorney's individual rate, as discussed below.

2. Individual Hourly Rates

"Most recently, fees in complex cases in the Eastern District have ranged between $400-$600 per hour for partners, $200-$400 per hour for associates and $75-100 per hour for paralegals." *N.Y. Ass'n for Retarded Children*, 2019 WL 3288898, at *3; *see also McLaughlin v. IDT Energy*, 2018 WL 3642627, at *17 (E.D.N.Y. July 30, 2018) (concluding that the following hourly rates are appropriate in the Eastern District: "$550 for partners/equity owners with more

than thirty years of experience, $500 for partners/equity owners with more than fifteen years of experience, $450 for partners/equity owners with more than ten years of experience, $400 for senior associates/associates with more than ten years of experience, $350 for senior associates/associates with six to nine years of experience, $300 for associates with three to five years of experience, $250 for associates with fewer than three years of experience, and $75 for paralegals/administrative assistants").  "The highest rates in this district are reserved for expert trial attorneys with extensive experience before the federal bar, who specialize in the practice of civil rights law and are recognized by their peers as leaders and experts in their fields." *Scharff v. Cty. of Nassau*, 2016 WL 3166848, at *5 (E.D.N.Y. May 20, 2016) (internal quotation marks and citation omitted), *report and recommendation adopted*, 2016 WL 3172798 (E.D.N.Y. June 6, 2016); *see, e.g., Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 2019 WL 2870721, at *10 (E.D.N.Y. June 18, 2019) (awarding $600 hourly rates to two civil rights attorneys with fifty-plus years of experience, who had previously brought similar civil rights cases, argued cases before the Supreme Court, and worked as law school professors), *report and recommendation adopted*, 2019 WL 2869150 (E.D.N.Y. July 3, 2019).

### a.  Senior Attorneys

Plaintiffs propose awarding six senior attorneys who worked on this case a rate of $650. *See* Pls.' Mem. at 19; Lowenkron Decl. ¶ 7; Barbieri Decl. ¶ 10.  This exceeds the rate of $600 awarded to the most distinguished attorneys in this district.  *See, e.g., Centro*, 2019 WL 2870721, at *10.  The cases cited by plaintiffs in support of this hourly rate fail to convince the Court otherwise; in *Restivo* the court granted plaintiff's request for out-of-district rates, 2015 WL 7734100, at *3, and in *Schwartz*, contrary to what plaintiffs' explanatory parenthetical suggests, the highest rate awarded was $500, 2019 WL 1299192, at *9.

Beginning with AFJ, plaintiffs request a rate of $650 rate for work performed by Laura D. Barbieri and Arthur Schwartz.  Ms. Barbieri has over thirty-five years of experience as a trial attorney and a well-rounded background in education law.  Pls.' Mem. at 10.  Prior to working as Special Counsel at AFJ since 2012, where she acts as a plaintiff's litigation attorney and "maintains an active education and civil rights practice," she worked as a partner as a boutique litigation firm in New York City defending private schools.  Barbieri Decl. ¶¶ 14–15.  Before that, Ms. Barbieri had a long career in public service that included serving as a Bureau Chief within the New York State Attorney General's Office.  *Id.* ¶ 16.  She is now pursuing a Master's Degree in Education Policy, chairs the Committee on Education and the Law for the New York City Bar Association and "frequently guest lectures at the New York Law School and the [Bar Association] in the areas of disability, education, and civil rights law."  Pls.' Mem. at 10; Barbieri Decl. ¶ 18.  Mr. Schwartz is AFJ's principal and a highly regarded civil-rights litigator with over forty years of experience, who has "reached a verdict in more than twenty jury trials, has argued over fifty cases in the appellate courts, and has handled hundreds of arbitrations."  *Id.* ¶ 19.  Accordingly, I recommend awarding Ms. Barbieri and Mr. Schwartz an hourly rate of $600; though Ms. Barbieri has practiced law for fewer years than Mr. Schwartz, I find that her specialization in the area of education and disability law justifies awarding the two attorneys the same rate.

NYLPI seeks a $650 hourly rate for four of its attorneys: Ruth Lowenkron, Roberta Mueller, Brian FitzPatrick, and Katherine Rosenfeld.  Ms. Lowenkron has spent her 34-year career specializing in education and disability law.  Pls.' Mem. at 11; Cremin. Decl. at 4.  Ms. Lowenkron serves as the Director of NYLPI's Disability Justice Program; before that, she worked at the Education Law Center in New Jersey and has worked as a special education

hearing officer for the New York State Department of Education.  Pls.' Mem. at 11; Lowenkron Decl. ¶ 12.  She "is regarded as an expert in disability law and frequently teaches on the subject." Pls.' Mem. at 11.  Ms. Mueller likewise bring 35-years of experience to this case; not only is she an experienced civil rights litigator, but she has worked at the Education Law Center in Pennsylvania and the University of Maryland Department of Special Education.  *Id.*; Lowenkron Decl. ¶ 13.  Accordingly, I recommend awarding Ms. Lowenkron and Ms. Mueller the same $600 hourly rate as Ms. Barbieri and Mr. Schwartz.

I recommend awarding Mr. FitzPatrick a slightly lower rate of $500 per hour.  Though Mr. FitzPatrick has had a long and distinguished career as a litigator, he is not a principal and does not seem to have specialized in education and disability law to the same extent as Ms. Barbieri, Ms. Lowenkron, and Ms. Mueller.  Lowenkron Decl. ¶ 15.  I find that Ms. Rosenfeld is also entitled to a rate of $500.  Though she brings fewer years of experience, having graduated from Yale Law School in 2001, she has already had a distinguished career in civil litigation, working both as a partner as Emery, Celli, Brinckerhoff, and Abady, LLP, and as NYLPI's litigation director from 2014-2017.  *Id.* ¶ 11.

The most senior attorney from Stroock, Beth Norton, seeks a rate of $550.  Ms. Norton graduated from law school in 2005 and was formerly Special Counsel at Stroock.  In addition to her experience as a litigator—in both administrative and judicial proceedings—she holds a Ph.D. in Educational Leadership and previously spent ten years as a teacher and ten years as a consultant specializing in programs for students with disabilities.  Klinger Decl. ¶ 3.  I recommend awarding her an hourly rate of $450.

### b. Mid-Level Attorneys[4]

Plaintiffs seek a range of $350 to $500 for the work of mid-level attorneys, including

Chris Schuyler, Irene Mendez, and David Simunovich.

Mr. Schuyler is a senior attorney with NYLPI's Disability Justice Program who

graduated law school in 2011 and now has "nine years of experience litigating complex civil

rights disputes." Pls.' Mem. at 11; NYLPI Resumes at 4, Dkt. 157-10. He began working on

this case in 2019. *Id.* Ms. Mendez, who was also associated with NYLPI, graduated from law

school in 2013 and worked on the case through 2018. *Id.* at 8; Lowenkron Decl. ¶ 14. Mr.

Simunovich was formerly a senior associate at Stroock and had seven to eight years of

experience throughout his involvement in this suit. Pls.' Mem. at 13; McGrath Decl. ¶ 21. Prior

to attending law school, Mr. Simunovich taught for two years in the South Bronx through the

Teach for America program. Pls.' Mem. at 13. Given these attorneys' varying levels of

experience, I recommend awarding Mr. Simunovich a rate of $350, Mr. Schuyler a rate of $325,

and Ms. Mendez a rate of $300.

### c. Associates

Three associates performed work on this case: Kayley R. McGrath, Talona H. Holbert,

James Jackson. Ms. McGrath and Ms. Holbert both work for Stroock and graduated from law

---

[4] Defendants argue, with particular reference to and impact on senior and junior associates' rates, that each attorney's rate should be based on average experience over the course of the litigation as opposed to current experience. Defs.' Mem. at 19. Plaintiffs counter that rates should be based on those currently billed "to compensate for the delay in getting paid." Pls.' Reply 8–9, Dkt. 163. The Second Circuit does indeed require courts to award fees at current rates, "because 'compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed.'" *Ravina v. Columbia Univ.*, 2020 WL 1080780, at *7 (S.D.N.Y. Mar. 6, 2020) (quoting *Lochren v. Cty. of Suffolk*, 344 F. App'x 706, 709 (2d Cir. 2009)). This, however, does not mean that a lawyer who is now a senior associate should be compensated at that rate if they were a junior associate when they worked on the case; "[c]learly, the [current] rate for a junior associate should [be] applied to a lawyer who was a junior associate when the work was done." *Lochren*, 344 F. App'x at 710. Thus, in setting the hourly rates, I consider the current rates applicable to each attorney's experience at the time they worked on this suit and take particular note of each attorney's experience at the time they ceased working on this litigation.

school in 2015 and 2017, respectively.  Klinger Decl. ¶¶ 5–6.  Ms. McGrath worked extensively

on this litigation from 2016 through the present, as demonstrated by the 1,317 hours that she

logged, and "maintains an active education law practice representing children with special needs

in securing appropriate educational services and school placements."  *Id.* ¶ 5; Stroock Billing[5] at

177, Dkt. 157-4.  Ms. Holbert joined this case in 2019.  Klinger Decl. ¶ 6.  Accordingly, I

recommend awarding hourly rates of $250 to Ms. McGrath and $200 to Ms. Holbert.

Because Mr. Jackson was awaiting admission to the bar in the State of New York at the

time plaintiffs' application was submitted, *see* Barbieri Decl. ¶ 20, and initially worked on this

case as a student, *see* Pls.' Mem. at 10, I recommend awarding him a rate of $100.  *See Pichardo*

*v. El Mismo Rincon Latino Corp.*, 2018 WL 4101844, at *11 (E.D.N.Y. Aug. 7, 2018) (awarding

first-year associate not yet admitted to the bar "$100 per hour, which is the amount typically

awarded for services of a first year law clerk, and is the high end of the scale for paralegal

work"), *report and recommendation adopted*, 2018 WL 4100480 (E.D.N.Y. Aug. 28, 2018).

### d.  Paralegals

As noted previously, Stroock wrote off time billed by paralegals and AFJ apparently did

not have any paralegals working on this case.  NYLPI, however, seeks to recover fees at a rate of

$200 per hour for two "senior paralegals" who specialize in social work: Paola Martinez Boone

and Michelle Kraus.  Pls.' Mem. at 12; NYLPI Resumes at 5, 14.  Defendants object to this

aspect of plaintiffs' application, noting that plaintiffs "have not shown their social workers did

anything but non-compensable social work services."  Defs.' Mem. at 21.  Defendants cite

*Nicholson v. Williams*, 2004 WL 4780498, at *12 n. 23 (E.D.N.Y. Apr. 5, 2004), *opinion*

*amended and supplemented* (June 2, 2004), where the court compensated a social worker for

---

[5] The page numbers in the Stroock Billing records are above the "Date" column in the upper left corner.

time spent doing paralegal work, but not social work.  Applying the approach in *Nicholson* here,

a review of Ms. Boone and Ms. Kraus's resumes and time sheets suggests that the only work

they performed in this case was social and not paralegal work.  *See* NYLPI Resumes at 5, 14;

NYLPI Billing[6] at 135–36, 142, Dkt. 157-9 (billing for time spent on prognostic reports and

interviewing and/or preparing to interview clients).  Accordingly, I recommend denying

plaintiffs' request for fees relating to work performed by Ms. Boone and Ms. Kraus.

    In sum, the approved hourly rates are as follows:

| Attorney (Legal Group) | Approved Rate |
|---|---|
| Laura D. Barbieri (AFJ) | $600 |
| Arthur Schwartz (AFJ) | $600 |
| Ruth Lowenkron (NYLPI) | $600 |
| Roberta Mueller (NYLPI) | $600 |
| Brian FitzPatrick (NYLPI) | $500 |
| Katherine Rosenfeld (NYLPI) | $500 |
| Beth Norton (Stroock) | $450 |
| David Simunovich (Stroock) | $350 |
| Chris Schuyler (NYLPI) | $325 |
| Irene Mendez (NYLPI) | $300 |
| Kayley R. McGrath (Stroock | $250 |
| Talona H. Holbert (Stroock) | $200 |
| James Jackson (AFJ) | $100 |
| Paola Martinez Boone (NYLPI) | N/A |
| Michelle Kraus (NYLPI) | N/A |

*B.  Reasonable Number of Hours*

    The next step in awarding attorneys' fees is determining the reasonableness of the

number of hours expended by counsel.  "In determining what fee is reasonable, the court takes

account of claimed hours that it views as 'excessive, redundant, or otherwise unnecessary.'"

*Bliven v. Hunt*, 579 F.3d 204, 213 (2d Cir. 2009) (quoting *Hensley v. Eckerhart*, 461 U.S. 424,

434 (1983)).  Each entry in counsel's time records should be examined "with a view to the value

---

[6] The pages numbers of the NYLPI Billing records refer to the page numbers of the PDF filed at Dkt. 157-9.

of the work product of the specific expenditures to the client's case." *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997).

If the court finds "that some of the time was not reasonably necessary to the outcome of the litigation, it should reduce the time for which compensation is awarded accordingly." *Louis Vuitton Malletier, S.A. v. LY USA, Inc.*, 676 F.3d 83, 111 (2d Cir. 2012). As the Second Circuit has pointed out, however, "a district court is not required to 'set forth item-by-item findings concerning what may be countless objections to individual billing items.'" *Cabrera v. Schafer*, 2017 WL 9512409, at *13 (E.D.N.Y. Feb. 17, 2017) (quoting *Reiter v. Metro. Transp. Auth. of State of N.Y.*, 2007 WL 2775144, at *13 (S.D.N.Y. Sept. 25, 2007)). Instead, "where numerous deficiencies (including vague entries, block billing, excessive billing, utilizing a partner to accomplish tasks that could have been adequately completed by an associate and not reducing the hourly rate for travel time) pervade the fee application," courts may reduce the number of hours billed by an appropriate across-the-board percentage. *Cabrera*, 2017 WL 9512409, at *14.

Here, defendants seek several categories of reductions in addition to those that the plaintiffs have already volunteered. The Court finds some of those arguments persuasive and has identified additional instances of excessive hourly billing.

1. Unsuccessful Motions

Defendants identify various categories of hours billed which they claim are related to plaintiffs' unsuccessful efforts and should therefore be considered non-compensable. *See* Defs.' Mem. at 14–16. These categories include hours spent on several motions to compel, unsuccessful mediation efforts, and plaintiffs' state law claims that were dismissed by Judge Block's Memorandum and Order.

"[T]he critical factor in determining whether to reduce counsel's hours because of unsuccessful claims is the degree to which counsel achieved success in the lawsuit as a whole." *Restivo*, 2015 WL 7734100, at *3 (citing *Hensley*, 461 U.S. at 434–35); *see Deferio v. Bd. of Tr. of St. Univ. of N.Y.*, 2014 WL 295842, at *9 (N.D.N.Y. Jan. 27, 2014) ("[A] party is entitled to recover time spent on an unsuccessful motion as long as that motion was related to the case's successful outcome and was not frivolous."). Courts will award fees related to a prevailing party's unsuccessful efforts when that party "succeeded on claims that encompass the core issues in th[e] litigation and were interrelated with unsuccessful and withdrawn claims." *Equal Emp. Opportunity Com'n v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 236 (E.D.N.Y. 2018). "In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit," *Restivo*, 2015 WL 7734100, at *4 (citing *Hensley*, 461 U.S. at 434-35), particularly when the claims arise from "common core facts," *Chauca v. Park Mgmt. Sys., LLC*, 2016 WL 8117953, at *3–*4 (E.D.N.Y. July 18, 2016).

With these principles in mind, it is clear that plaintiffs may recover fees related to the dismissed state law claims and unsuccessful mediation efforts. Plaintiffs, as discussed above, obtained favorable results in this litigation, and should not be penalized for exploring, and ultimately bringing, state law claims arising from the same core set of facts. *See Hensley*, 461 U.S. at 435 ("Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.").

Defendants' further contention that plaintiffs should not be compensated for settlement negotiations is meritless; parties have no obligation to accept a settlement agreement and this Court is in no position to assess a party's decision that settlement is premature or that a

settlement offer is insufficient to warrant acceptance. *See Ortiz v. Regan*, 980 F.2d 138, 140–41 (2d Cir. 1992) ("A district court should not rely on informal negotiations and hindsight to determine whether further litigation was warranted and, accordingly, whether attorney's fees should be awarded.  Otherwise, plaintiffs with meritorious claims may be improperly dissuaded from pressing forward with their litigation."); *Samborski v. Linear Abatement Corp.,* 1999 WL 739543, at *2 (S.D.N.Y. Sept. 22, 1999) ("Although the parties were close to settlement at various times during this litigation, the fact is that both sides were unwilling to compromise to the extent necessary to bring about a resolution until after a substantial effort had been expended … I cannot say that plaintiffs were the sole impediment to a more timely settlement. Defendants were just as stubborn.").

In making this argument, defendants unfortunately reveal the dollar amounts of settlement demands and offers made by the parties, which are ordinarily treated as confidential.  Their disclosure, moreover, suggests that plaintiffs negotiated in good faith and did not prolong the case unnecessarily by taking unreasonable positions during settlement discussions.  First, defendants argue that plaintiffs "blew up" a settlement with defendant Brown.  Defs.' Mem. at 3-4.  However, even if that characterization is apt, it is of little moment because a settlement only with defendant Brown would not have impacted the duration or scope of the litigation.  Second, defendants suggest that the case came to an end not because they altered their settlement position but because, once they tendered an offer of judgment, plaintiffs' counsel recognized they could no longer expect to be awarded fees for their time.  Defendants acknowledge, though, that their last offer before invoking Rule 68 was for $350,000.00 inclusive of attorneys' fees, Defs.' Mem. at 7, a far cry from their Rule 68 offer of judgment in the amount of $1,100,000.00 plus attorneys' fees that plaintiffs agreed to accept.

Defendants' argument with respect to plaintiffs' discovery motions are also, for the most part, unpersuasive.  Though plaintiffs did not prevail in all discovery disputes, their efforts were surely not fruitless.  The first motion was granted in whole and ensured that, despite defendants' initial resistance, discovery progressed as the motion to dismiss was pending.  *See* Tr. of Jan. 12, 2017, at 4–11, Dkt. 62.  In addition, the defendants' characterization of the *in camera* review held on January 3, 2020, as largely unsuccessful, in that plaintiffs obtained "just ten" of the 120 documents, *see* Defs.' Mem. at 6 n. 6, ignores the fact that there were actually far fewer than 100 documents in dispute.  *See* Tr. of Jan. 3, 2020, at 7:13-20, Dkt. 144.  Plaintiffs, moreover, apparently viewed the documents withheld by defendants on grounds of privilege as vital to their case.  For these reasons, defendants' "hour-by-hour analysis is misplaced, and ignores the reality that in the cut and thrust of any protracted litigation, no party wins every skirmish.  Attorneys who do not risk the occasional unsuccessful argument most likely are doing their clients a disservice."  *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.,* 2009 WL 5185808, at *7 (E.D.N.Y. Dec. 23, 2009), *aff'd*, 409 F. App'x 389 (2d Cir. 2010).  Moreover, to the extent defendants object to the number of hours plaintiffs spent on the discovery motions in the last year of litigation, those concerns are accounted for below.

I do, however, agree with defendants that plaintiffs' attorneys should not recover fees for their work litigating plaintiffs' final motion to compel.  The Court denied this motion without prejudice to renewal because plaintiffs failed to meet and confer before filing the motion and it was "reasonable to believe that conferring would have eliminated the need for the pending motion or at least narrowed its scope."  Order dated Feb. 28, 2020.  *See Brown v. Barnes & Noble, Inc.*, 2020 WL 5037573, at *3 (S.D.N.Y. Aug. 26, 2020) (noting that fees associated with a party's motion to compel may be denied when "the party filing the motion did not meet and

confer in good faith before filing the motion"); *see also Gropper v. David Ellis Real Estate, L.P.*, 2014 WL 518234, at *2 (S.D.N.Y. Feb. 10, 2014) ("A motion to compel discovery 'must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.'" (quoting Fed. R. Civ. P. 37(a)(1)). The motion, it bears noting, was never renewed.

Accordingly, plaintiffs' requested hours are reduced by the 43.1 hours spent on the final motion to compel. Specifically, the hours are reduced as follows:

| Attorney | Relevant Billing Entries | Hours |
|----------|--------------------------|-------|
| Kayley R. McGrath | Entries dated 1/30/2020 through 2/7/2020 | 4.5 |
| Talona H. Holbert | Entries dated 1/30/2020 through 2/7/2020 | 21.8 |
| Laura Barbieri | Entries dated 2/5/2020, 2/7/2020 (1st entry) | .6 |
| Ruth Lowenkron | Entries dated 1/30/2020, 1/31/2020, 2/5/2020, 2/6/2020, 2/7/2020 (1st entry) | 1.6 |
| Brian FitzPatrick | Entries dated 2/5/2020 (1st entry), 2/6/2020, 2/7/2020 | 9.1 |
| Chris Schuyler | Entries dated 1/30/2020 (1st entry), 2/6/2020, 2/7/2020 | 5.5 |
|  | **Total** | **43.1** |

2. Overstaffing

Defendants next argue that the inefficiencies that resulted from plaintiffs' overstaffing warrant a reduction in the total hours billed. Defs.' Mem. at 14. Indeed, despite the Court's admonition at the initial conference that "[w]e can't have five lawyers billing for an initial case management conference," plaintiffs' attorneys now seek compensation for many hours of duplicative work and intraoffice communications, most of which appear to be the result of overstaffing.

"The use of multiple attorneys ... is not unreasonable per se." *Simmonds v. New York City Dep't of Corr.*, 2008 WL 4303474, at *6 (S.D.N.Y. Sept. 16, 2008); *see also, e.g., Berrian v. City of New York*, 2014 WL 6611356, at *10–*11 (S.D.N.Y. July 28, 2014), *report and recommendation adopted in part*, 2014 WL 6604641 (S.D.N.Y. Nov. 21, 2014). "[M]any tasks in fact require or benefit from the attention of more than one attorney"; for example, "having two

attorneys research and participate in drafting a brief is a common practice and therefore not necessarily duplicative." *Doe v. Darien Bd. of Educ.*, 2015 WL 8770003 2, at *7 (D. Conn. Dec. 14, 2015) (internal alteration and citation omitted).  However, "[w]here a plaintiff is represented by multiple attorneys, of course, a court reviewing a fee application should be particularly attentive to the risk of inefficiency and avoid making the defendant subsidize it." *Cruceta v. City of New York*, 2012 WL 2885113, at *6 (E.D.N.Y. Feb. 7, 2012), *report and recommendation adopted*, 2012 WL 2884985 (E.D.N.Y. July 13, 2012).  "In such circumstances, a court should 'compensate only that work which was necessary to the litigation and which constituted a cost efficient use of co-counsel and outside counsel.'" *Id.* (quoting *Sullivan v. Syracuse Hous. Auth.*, 1993 WL 147457, at *3 (S.D.N.Y. May 3, 1993)); *Simmonds*, 2008 WL 4303474, at *6.

Here, though the complexity of this litigation justified collaboration among multiple attorneys, four-plus attorneys repeatedly billed for the same straightforward tasks.  For example, four attorneys each billed at least two hours for their attendance at the final in-person conference on January 3, 2020, during which the Court conducted an *in camera* review of documents withheld by defendants on grounds of privilege.  Because the purpose of this conference was for the Court to conduct an *in camera* review of defendants' privileged documents, plaintiffs' attorneys spent most the of the time billed at the back of the room, out of earshot.  Tr. of Jan. 3, 2020, at 15:23–16:4, 17:6-11.  The presence of four attorneys on that occasion, as well as on others, was not necessary to the litigation nor a cost-efficient use of co-counsel.  Defendants identify other instances where five or six attorneys billed for the same activity.  *See, e.g.,* Entries dated August 11, 2016, re Call (six attorneys billing for co-counsel call); Entries dated Jan. 12, 2017, (five attorneys billing for call with defendants); Entries dated August 21, 2018 (four

attorneys billing for co-counsel call); Entries dated August 21, 2019 (four attorneys billing for co-counsel call).

Many of these examples raise the related issue of the time spent by plaintiffs' counsel on intraoffice communications. Though "the time spent by two [or three] attorneys discussing the case with one another is properly billed," *Darien Bd. of Educ.,* 2015 WL 8770003, at \*7, the amount of time plaintiffs' counsel spent on intraoffice communications appears excessive, likely due to the fact that there were so many attorneys to include in the communications. To illustrate, during October 2017—a month picked at random—plaintiffs' counsel collectively billed 14.85 hours on intraoffice communications, averaging to about 3.7 hours per week. *See* AFJ Billing at 43–44, Dkt. 157-12; NYLPI Billing at 6, 114–15; Stroock Billing at 111–14.[7] Those 3.7 hours spent on intraoffice communications per week are more than twice the 1.5 hours some courts have found to be a reasonable amount of time spent on intraoffice communications. *See D.B. on behalf of S.B. v. New York City Dep't of Educ.*, 2019 WL 4565128, at \*4 (S.D.N.Y. Sept. 20, 2019) (concluding that 6.45 hours billed in intraoffice communications per month, or about 1.6 hours per week, was reasonable in light of two different firms having worked on the case, requiring "even greater 'collaboration and rehearsal'"). Related to the time spent on intraoffice communications, defendants highlight the many hours plaintiffs spent sorting out the business issues that arose from having three offices work on this suit. Mr. Schwartz alone spent more than 12 hours on the "business of having multiple firms litigate," Safane Ex. A-16, Dkt. 161-17;

---

[7] Determining the amount of time Stroock spent on intraoffice communications was complicated by the firm's practice of block billing, discussed in more detail below. To estimate the amount of time Stroock spent on intraoffice communications, I divided each of Stroock's relevant billing entries that referred to more than one task by the number of tasks listed and then multiplied that unit by the number of tasks relating to intraoffice communications.

this is not entirely surprising given Mr. Schwartz's position as principal, but it bears noting nevertheless, especially given his requested rate of $650.

In addition, though plaintiffs insist that they "divided litigation tasks along discrete lines" between firms to ensure efficiency, *see* Pls.' Mem. at 13–14, a review of the billing records suggests that the three legal groups failed to adhere to any purported strict delegation of duties. This failure, which apparently resulted in a duplication of efforts, also warrants a reduction in the hours billed. *See Held & Hines LLP v. Hussain*, 2019 WL 5722128, at *7 (S.D.N.Y. Aug. 7, 2019) (reducing fees of one law firm because although co-counsel took the lead in oral argument, the other firm "[n]evertheless, []saw fit to bring three attorneys, including two partners, to both conferences"), *report and recommendation adopted as modified*, 2019 WL 4727465 (S.D.N.Y. Sept. 27, 2019); *Cleanup N. Brooklyn by Chantrtanapichate v. Brooklyn Transfer LLC*, 373 F. Supp. 3d 398, 407 (E.D.N.Y. 2019) (finding arrangement where one attorney "completed the bulk of the work, while nearly all other counsel researched, reviewed, and edited substantially the same matters" to be an indication of some "uncompensable duplication of effort."); *Simmonds*, 2008 WL 4303474, at *6–*7 (finding number of hours billed excessive where "the delegation of authority [between firms] was rarely, if ever, complete," "both firms were heavily involved in all aspects of the litigation," and "[a]ttorneys from both firms routinely reviewed and revised each others' work product and jointly attended court conferences and meetings with clients and co-counsel").

For example, though AFJ apparently took the lead in "investigating, researching, and drafting the Complaint," Pls.' Mem. at 13, its attorneys spent 19 hours on the initial complaint, while NYLPI lawyers spent 33 hours and Stroock attorneys spent 47 hours.[8]  AFJ Billing at 2–3;

---

[8] Again, due to Stroock's block billing, it was difficult to separate time spent on the Complaint from other tasks but this number is at least an estimate of the amount of time spent on the initial Complaint.  As with intraoffice

NYLPI Billing at 32–46, 137–38; Stroock Billing at 1–7.  Of course, this billing all took place prior to all three legal groups consolidating the action, but a review of the hours spent on preparing the amended consolidated Complaint also suggests that tasks were not efficiently divided between the legal groups; in connection with planning, drafting, and filing of the amended Complaint AFJ billed about 30 hours, NYLPI 20, and Stroock 67.  AFJ Billing at 3–9; NYLPI Billing at 48–51, 126, 138–40; Stroock Billing at 8–29.

Another area where the billing records do not suggest efficient delegation relates to the discovery disputes that took place late in the suit, by which point counsel had ample opportunity to sort out the division of tasks.  It appears that Mr. FitzPatrick of NYLPI and Ms. McGrath and Ms. Holbert of Stroock all billed a significant amount of time in connection with both the privilege issues that led to the Court's *in camera* review on January 3, 2020, and the final motion to compel, all of which suggests that individual offices were not in fact taking the lead on certain issues but that lawyers from two or more offices were performing duplicative work.  *See, e.g.*, NYLPI Billing at 18–21 (Billing entries dated Sept. 22, 2019, through Feb. 7, 2020); Stroock Billing at 162–77 (Billing entries dated Sept. 4, 2019, through Feb. 7, 2020).

Because of the overstaffing and duplicative billing described above, I recommend reducing the total hours billed by 20%.  *See Kindle v. Dejana*, 308 F. Supp. 3d 698, 714 (E.D.N.Y. 2018) (reducing hours billed by 10% across the board "in order to mitigate instances of duplicative and unnecessary billing, which, despite counsel's best efforts, is an inherent issue in protracted litigation involving the retention of and contemporaneous work performed by multiple law firms"); *Grievson v. Rochester Psychiatric Ctr.*, 746 F. Supp. 2d 454, 467–69 (W.D.N.Y. 2010) (reducing the total hours requested by 20% in case where multiple attorneys

---

communications, when many tasks were included in one billing entry, I divided the total hours by the number of tasks to estimate the amount of time spent on each task within the billing entry.

attended court conferences and plaintiffs billed approximately 77 hours for meetings between attorneys); *Tucker v. Mukasey*, 2008 WL 2544504, at *2 (S.D.N.Y. June 20, 2008) (applying 30% reduction for "excessive, unnecessary, and/or vague" time entries where "many entries note that several lawyers billed simultaneously on a single task").

### 3. Firm-Specific Issues

Having reviewed each office's individual records, the Court has identified two additional aspects of plaintiffs' application warranting further reductions.

#### a. **Stroock's Block Billing**

Defendants challenge Stroock's practice of block billing and argue that this warrants a further reduction of hours. Defs.' Mem. at 16. "Where billing records include a large number of block-billed entries and there is an issue as to the reasonableness of the number of hours counsel spent on the matter, an across-the-board reduction in billing hours is appropriate." *See Linde v. Arab Bank, PLC*, 293 F.R.D. 138, 142–43 (E.D.N.Y. 2013).

Here, Stroock's billing records include numerous block-billed entries that attribute several or more tasks to one unit of time. *See, e.g.,* Stroock Billing at 7 (block billing in each entry). As noted above, this practice limits the Court's ability to determine the amount of time spent on discrete tasks, such as intraoffice communications or specific filings, like the Complaint. Even with that impediment—that is, without being able to determine the precise number of hours Stroock attorneys spent on discrete tasks—it is clear that Stroock's billing is the most excessive of the three plaintiff-firms. For example, Stroock spent more than 100 hours[9] on the first two complaints and billed half[10] of the total hours spent on intraoffice communications

---

[9] Specifically, as noted in the previous section, Stroock billed approximately 47 hours on the initial Complaint and 67 hours on the amended Complaint. *See* Stroock Billing at 1–29.

[10] Specifically, Stroock billed 7.75 of the total 14.85 hours. *See* Stroock Billing at 111–14.

in the month referred to in support of the first percentage reduction; in fact, almost all of Stroock's numerous block billing entries reference intraoffice communications. I therefore recommend reducing the hours billed by Stroock by an additional 10%.

### b.   Brian FitzPatrick's Hours

As noted previously, defendants object generally to the time plaintiffs' attorneys spent on what were, in their view, unsuccessful and fruitless discovery motions, all of which "continued to run up fees." *See* Defs.' Mem. at 5–7. While the Court does not endorse defendants' blanket characterization of plaintiffs' discovery motions, the time spent by Mr. FitzPatrick on "legal and factual research" concerning the same, ongoing privilege issues presented by the discovery disputes in late 2019 and early 2020 seems excessive. *See* Mot. to Compel at 3–4, Dkt. 134-1, and Pls.' Resp. Ltr. dated Dec. 10, 2019, at 1–3, Dkt. 139-1 (both discussing the limitations of the attorney-client and work product privilege.). Mr. FitzPatrick spent approximately 46 hours researching and drafting the Motion to Compel filed in November 2019, another 14 hours researching and drafting the reply, and another 40 hours researching and drafting plaintiffs' opposition to defendants' December 2019 letter concerning related discovery issues. *See* NYLPI Billing at 17–21.

These hours are particularly high in light of Mr. FitzPatrick's request for an hourly rate of $650 based upon his 30-plus years of litigation experience, *see* Lowenkron Decl. ¶ 15, and this Court's recommendation that his time be valued at $500 per hour. One would expect an attorney of Mr. FitzPatrick's tenure to possess a foundational knowledge of issues surrounding attorney-client privilege that would reduce the need for such extensive research, and to delegate the task to a more junior attorney when extensive research is required. Simply stated, "plaintiffs cannot have it both ways by seeking fees at or above the highest range for this district based on their

claimed skill and experience, while also spending an inordinate amount of time researching and editing briefs that more experienced counsel could complete more quickly." *Cleanup N. Brooklyn*, 373 F. Supp. 3d at 407 (internal quotation marks and citation omitted). Accordingly, I recommend a 10% reduction of Mr. FitzPatrick's hours.

    4.  <u>Other Issues</u>

    Defendants object to additional aspects of plaintiffs' hourly billing, including that plaintiffs' senior attorneys seek their full hourly rate for paralegal-type work, bill travel time at more than one-half the time spent travelling, and seek compensation for time spent trying to engage additional clients in the litigation. *See* Defs.' Mem. at 15–16. Though some of these arguments have merit,[11] the across-the board reductions recommended above are sufficient to correct for these other inefficiencies. *See Fox v. Vice*, 563 U.S. 826, 838 (2011) ("[T]rial courts need not, and indeed should not, become green-eyeshade accountants [and]…may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time."); *Lora v. J. V. Car Wash, LTC.*, 2015 WL 4496847, at *11 n. 21 (S.D.N.Y. July 24, 2015) (concluding that the previous across the board reduction imposed by the court "takes into account any additional time that should not have been billed"), *report and recommendation adopted*, 2015 WL 7302755 (S.D.N.Y. Nov. 18, 2015).

---

[11] In particular, defendants correctly point out that plaintiffs' most senior attorneys should not have billed their full hourly rate for time spent on paralegal-type tasks and compile a list of specific examples when this occurred. *See* Safane Ex. A-18, Dkt. 161-19. As noted in the text, though, the other adjustments sufficiently correct for this type of overbilling.

In total, plaintiffs' hours are reduced as follows:

| Attorney | Requested Hours | (Final Motion to Compel Hours) | (20% Overstaffing Reduction)[12] | (10% Reduction on Stroock and Brian FitzPatrick Hours)[13] | TOTAL APPROVED HOURS |
|---|---|---|---|---|---|
| Laura Barbieri | 547.80 | .6 | 109.44 | 0 | **437.76** |
| Arthur Schwartz | 61.90 | 0 | 12.38 | 0 | **49.52** |
| Ruth Lowenkron | 209.00 | 1.6 | 41.48 | 0 | **165.92** |
| Roberta Mueller | 41.80 | 0 | 8.36 | 0 | **33.44** |
| Brian FitzPatrick | 566.00 | 9.1 | 111.38 | 44.55 | **400.97** |
| Katherine Rosenfeld | 55.07 | 0 | 11.01 | 0 | **44.06** |
| Beth Norton | 550.70 | 0 | 110.14 | 44.06 | **396.50** |
| David Simunovich | 381.10 | 0 | 76.22 | 30.49 | **274.39** |
| Chris Schuyler | 91.00 | 5.5 | 17.10 | 0 | **68.40** |
| Irene Mendez | 520.80 | 0 | 104.16 | 0 | **416.64** |
| Kayley R McGrath | 1317.00 | 4.5 | 262.50 | 105 | **945.00** |
| Talona H. Holbert | 36.00 | 21.8 | 2.84 | 1.14 | **10.22** |
| James Jackson | 42.10 | 0 | 8.42 | 0 | **33.68** |
| **TOTAL** | **4420.27** | **43.1** | **875.43** | **225.24** | **3,276.50** |

Together with the approved hourly rates, I recommend awarding plaintiffs the following fees:

| Attorney (Legal Group) | Approved Rate | Approved Hours | Lodestar |
|---|---|---|---|
| Laura D. Barbieri (AFJ) | $600 | 437.76 | **$262,656.00** |
| Arthur Schwartz (AFJ) | $600 | 49.52 | **$29,712.00** |
| Ruth Lowenkron (NYLPI) | $600 | 165.92 | **$99,552.00** |
| Roberta Mueller (NYLPI) | $600 | 33.44 | **$20,064.00** |
| Brian FitzPatrick (NYLPI) | $500 | 400.97 | **$200,485.00** |
| Katherine Rosenfeld (NYLPI) | $500 | 44.06 | **$22,030.00** |
| Beth Norton (Stroock) | $450 | 396.50 | **$178,425.00** |
| David Simunovich (Stroock) | $350 | 274.39 | **$96,036.50** |
| Chris Schuyler (NYLPI) | $325 | 68.40 | **$22,230.00** |
| Irene Mendez (NYLPI) | $300 | 416.64 | **$124,992.00** |
| Kayley R. McGrath (Stroock) | $250 | 945.00 | **$236,250.00** |
| Talona H. Holbert (Stroock) | $200 | 10.22 | **$2,044.00** |
| James Jackson (AFJ) | $100 | 33.68 | **$3,368.00** |
| Paola Martinez Boone (NYLPI) | N/A | N/A | **N/A** |
| Michelle Kraus (NYLPI) | N/A | N/A | **N/A** |
| | | **TOTAL** | **$1,297,844.50** |

---

[12] This percentage reduction was applied to the total number of hours *after* the hours spent on the final motion to compel were subtracted.

[13] This percentage reduction was applied, where applicable, to the total number of hours *after* the hours spent on the final motion to compel *and* the overstaffing percentage-reduction were subtracted.

### III.    Costs

Plaintiffs are also entitled to recover "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) (internal quotation marks and citations omitted).  Reasonable expenses include postage, travel, and photocopying, as "distinguished from non-recoverable routine office overhead, which must normally be absorbed within the attorney's hourly rate." *Id.* (quoting *Kuzma v. I.R.S.*, 821 F.2d 930, 933–34 (2d Cir. 1987)); *Duke v. Cty. of Nassau*, 2003 WL 23315463, at *6 (E.D.N.Y. Apr. 14, 2003) ("Courts have continuously recognized the right for reimbursement of costs such as photocopying, postage, transportation, transcript fees and filing fees.").

Here, plaintiffs request reasonable court filing and PACER fees as well as Westlaw and travel expenses.  Pls.' Mem. at 25.  Defendants do not object to any specific component of plaintiffs' costs but do propose reducing NYLPI's and Stroock's costs by 33% "for vagueness." Defs.' Mem. at 25 n. 24.  NYLPI's requests for "Filing Fees" "Legal Research (Westlaw & Pacer)," "Mailings," "Printing & Copying," and "Local Travel," *see* Lowenkron Decl. ¶ 9, are, however, clearly identified, and are reasonable costs that would ordinarily be charged to a paying client. *See BBY Sols., Inc. v. Schwartz*, 2011 WL 6986937, at *7 (E.D.N.Y. Nov. 17, 2011) ("The expenditures incurred in the within action include costs for legal research, overnight mail delivery, investigation-related fees, photocopies, court filing fees, messenger services, travel-related fees, and process server fees, all of which are routinely recoverable."), *report and recommendation adopted*, 2012 WL 90347 (E.D.N.Y. Jan. 11, 2012).  Stroock may also recover costs to cover "mediation fees" and "Westlaw/Lexis case research," totaling $22,640.06. *See* Pls.' Mem. at 9, 25. *See In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *10

(S.D.N.Y. Nov. 7, 2007) (granting plaintiff's request for reimbursement of mediation fees, among other expenses, because it was a "customary and necessary expense[] for a complex [] action").

Stroock seeks to recover $50,230.39 in expert fees. *See* Pls.' Mem. at 9. This amount, however, may not be awarded by this Court. Though defendants do not object to this aspect of plaintiffs' fee application beyond seeking the general reduction noted above, "the court has no authority to shift plaintiffs' expert witness fees to defendants in [] a case [brought under 42 U.S.C. § 1983]." *Barriere v. Flynn*, 2007 WL 9723183, at *2 (E.D.N.Y. Apr. 11, 2007). The Civil Rights Act of 1991 permits expert-fee shifting only when a suit is brought pursuant to Section 1981 or 1981(a). *Walker v. City of New York*, 2015 WL 4568305, at *12–*13 (E.D.N.Y. July 28, 2015); *Wilder v. Bernstein*, 975 F. Supp. 276, 287 n. 12 (S.D.N.Y. 1997) ("After [*W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83 (1991)], Congress enacted the Civil Rights Act of 1991, which amended 42 U.S.C. § 1988 to give courts discretion to shift expert fees to the losing party in cases arising under 42 U.S.C. §§ 1981 and 1981(a)…*Casey* still prohibits the award of expert fees in § 1983 cases."). Because Section 504 of the Rehabilitation Act provides the same "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964," 29 U.S.C. § 794a(a)(2), it follows logically that it too does not allow for reimbursement of expert fees.[14]

---

[14] Courts appear to be split on this issue, and the Second Circuit has yet to weigh in. *Compare M.P., ex rel. K.P. v. Indep. Sch. Dist. No. 721*, 2007 WL 844688, at *4 (D. Minn. Mar. 16, 2007) (denying expert fees pursuant to the Rehabilitation Act because it incorporates the remedies available under the Civil Rights Act), *with L.T. ex rel. B.T. v. Mansfield Twp. Sch. Dist.*, 2009 WL 2488181, at *2 (D.N.J. Aug. 11, 2009) (awarding expert fees to prevailing party under section 504 of the Rehabilitation Act because it incorporates the remedies available under the Civil Rights Act). There appears to be only one relevant opinion issued by a district court in this circuit; in *L.V. v. New York City Dep't of Educ.*, 700 F. Supp. 2d 510, 515 n. 7, 529 (S.D.N.Y. 2010), the Southern District reimbursed plaintiffs for expert fees in a case primarily concerning IDEA, but also brought pursuant to Sections 504 and 1983. However, the court did not explicitly consider whether expert fee awards were authorized under either Sections 504 or 1983. Because the precedent is clear that expert fee awards are not permitted under Section 1983, the two exceptions to this general rule have been limited to Sections 1981 and 1981(a), and Section 504 references the very remedies provided by the Civil Rights Act, I recommend denying plaintiffs' request for expert costs.

I therefore recommend denying plaintiffs' request for costs to the extent it includes expert fees, but awarding costs of $400.00 to AFJ, $2,332.24 to NYLPI, and $22,640.06 to Stroock.

CONCLUSION

For the reasons set forth above, I respectfully recommend awarding plaintiffs attorneys' fees of $1,297,844.50 and costs of $25,372.30.

Objections to the recommendations made in this Report must be submitted within fourteen days after filing of the Report and, in any event, no later than January 18, 2021. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. Proc. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten-day limit).

/s/
Steven M. Gold
United States Magistrate Judge

Brooklyn, New York
January 3, 2021

*U:\#ECC 2019-2020\15-7058 Lawton v. Success Academy\15-cv-7058 Lawton v. Success Atty Fees FINAL.docx*